396                May 15, 2014                No. 53

IN THE OREGON TAX COURT
REGULAR DIVISION

Marlin "Mike" E. HILLENGA
and Sheri C. Hillenga,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5086)

Plaintiffs (taxpayers) appealed a Magistrate Division decision as to income tax. Taxpayers alleged that they were not Oregon residents for the purpose of determining Oregon income tax liability for the calendar year 2006. Taxpayers also disputed certain adjustments made by Defendant Department of Revenue (the department) to taxpayers' 2006 Oregon income tax return that increased taxpayers' Oregon income tax liability, and to certain penalties imposed by the department. Following trial, the court found that taxpayers were domiciled in Oregon for the tax year at issue and that the department's adjustments and imposed penalties were proper.

Trial was held on March 19 and 20, 2013, in the courtroom of the Oregon Tax Court, Salem.

Kevin P. O'Connell, Hagen O'Connell LLP, Portland argued the cause for Plaintiffs (taxpayers).

Darren Weirnick, Senior Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant Department of Revenue (the department).

Decision for Defendant rendered May 15, 2014.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This case comes before the court for decision following a trial in the Regular Division. Plaintiffs (taxpayers) allege that they were not Oregon residents for purpose of determining Oregon income tax liability for the calendar year 2006. Taxpayers also dispute certain adjustments made by Defendant Department of Revenue (the department) to taxpayers' 2006 Oregon income tax return that increased taxpayers' Oregon income tax liability, and to certain penalties imposed by the department.

## II.   FACTS

At the time of trial, taxpayers Sheri Hillenga and Mike Hillenga had been married for 45 years. Mike Hillenga has a background in engineering and marketing, and since 1967 has operated a sole proprietorship engaged in several different, but broadly speaking, related business activities. In 2006 the largest part of taxpayers' business consisted of putting together engineering design proposals. Taxpayers' sole customer in 2006 was Space Systems/Loral, an aerospace firm located in Palo Alto, California. Representative past work in related areas has included, for example, formatting college level textbooks for publication. In 1976 Sheri Hillenga began working for this sole proprietorship and has remained involved in its business activities through the time of trial.

Taxpayers own four residences: one in Coloma, California, that taxpayers acquired in 1973; one in Iowa that has been in Mike Hillenga's family for several generations; one in Ashland, Oregon, that taxpayers obtained by gift from family of Sheri Hillenga in 1975; and one in Italy that taxpayers acquired in 2005. Taxpayers split their time in 2006 between their four residences, spending 131 days in Coloma; 91 days in Ashland; 16 days in Iowa; and 120 days in Italy. Taxpayers also own rental properties in the vicinity of Ashland.

At some point prior to 1990, taxpayers were involved in an unspecified fashion with the development of a product known as the Zoex Non-Inflatable Anti-Shock Garment (referred to hereinafter as the "Zoex garment"). The precise nature of this product is not material to this case, but the substance of the presentation at trial was that it is designed for medical use. Starting in 1990, and proceeding through the time of trial, taxpayers have been involved in marketing the Zoex garment to various potential customers both in the United States and abroad. The precise nature of taxpayers' interest in the Zoex garment is not clear from the record. Taxpayers do not appear to own the underlying intellectual property or to own an interest in any company that does own such intellectual property, but Taxpayers had—and continued to have at the time of the trial in this case—a

relationship of sorts with Dr. Richard Pellagra, who was also involved in the development of the Zoex garment and who organized a corporation in the early 1990s to market the Zoex garment. The record shows that taxpayers began marketing the Zoex garment pursuant to an oral agreement with Dr. Pellagra, though the precise terms of that arrangement are not in the record. At trial Sheri Hillenga testified that Dr. Pellagra did not receive any economic benefit from taxpayers' marketing of the Zoex garment. The record indicates that despite their efforts, taxpayers sold few—if any—Zoex garments from 1990 through 2006, though in subsequent years taxpayers derived substantial income from Zoex sales. Taxpayers did not sell any Zoex garments and had no gross income from their Zoex activities in 2006.

At some point in 2001 taxpayers surrendered their California driver's licenses and obtained Oregon driver's licenses. These licenses showed their residence in Ashland, Oregon, as their primary address. Taxpayers also registered to vote in Oregon at about the same time, again representing their Ashland address as their primary residence. Starting in 2001, and proceeding through at least 2006, taxpayers filed full-year resident Oregon income tax returns and paid California income taxes as nonresidents. In addition, taxpayers registered several motor vehicles in Oregon during this time.

Following audit of taxpayers' 2006 Oregon income tax return, the department proposed numerous adjustments resulting in net tax owed. Taxpayers requested a conference. While the conference officer's determinations were somewhat more favorable to taxpayers than were the adjustments originally proposed by the auditor, they still resulted in net tax owed. The department issued a Notice of Deficiency to taxpayers on December 2, 2010, and taxpayers appealed to the Magistrate Division of this court. Following trial the magistrate found for the department and taxpayers appealed to the Regular Division. Additional facts are stated below where relevant.

## III.  ISSUES

(1)  Whether taxpayers were Oregon residents during the 2006 tax year;

(2)   Whether the department's adjustments to taxpayers' 2006 Oregon income tax return were proper;

(3)   Whether expenses attributable to taxpayers' Zoex sales activities were deductible business expenses;

(4)   The amount, if any, of a 2004 Net Operating Loss (NOL) that taxpayers may carry forward on their 2006 income tax return;

(5)   Whether the department properly imposed penalties on taxpayers; and

(6)   The amount, if any, of taxpayer's 2006 "kicker" refund.

## IV.   ANALYSIS

The parties raise a wide range of issues in their pleadings. In the interest of brevity, the court will begin its analysis by addressing the issues with the broadest significance first. The outcome on these questions will then guide the court's analysis of the more particular questions—especially, but not exclusively, the adjustments by the department to taxpayers' 2006 Schedule C. The broad questions that the court will first address are: (1) whether taxpayers were residents of this state for purposes of Oregon Income Tax liability in 2006; (2) the tax treatment of taxpayers' Zoex garment activities; and (3) what proportion, if any, of taxpayers' home in Coloma, California, was "exclusively used on a regular basis" for a qualifying business purpose under IRC section 280A.

Taxpayers are the plaintiffs in this case and thus have the burden of proof on all questions of fact other than those relating to the 2004 NOL carry forward, which the department raised as a counterclaim in its answer. ORS 305.427.[1]

A.   *Analysis of the Over-Arching Issues*

    1.   *Whether Taxpayers were Domiciled in Oregon in 2006*

ORS 316.037 provides, in pertinent part:

"(1)(a)   A tax is imposed for each taxable year on the entire taxable income of every resident of this state. * * *

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2005.

"* * * * *

"(3)     A tax is imposed for each taxable year on the taxable income of every full-year nonresident that is derived from sources within this state."

ORS 316.027 provides, again in pertinent part:

"(1)     For purposes of this chapter, unless the context requires otherwise:

"(a)     'Resident' or 'resident of this state' means:

"(A)     An individual who is domiciled in this state unless the individual:

"(i)     Maintains no permanent place of abode in this state;

"(ii)     Does maintain a permanent place of abode elsewhere; and

"(iii)     Spends in the aggregate not more than 30 days in the taxable year in this state; or

"(B)     An individual who is not domiciled in this state but maintains a permanent place of abode in this state and spends in the aggregate more than 200 days of the taxable year in this state unless the individual proves that the individual is in the state only for a temporary or transitory purpose."

In other words, Oregon imposes a tax on the entire taxable income of Oregon residents—even income earned from sources outside of this state, unless explicitly exempted. Full-year nonresidents of Oregon need only pay Oregon income tax on the proportion of their income derived from sources in Oregon.

A person is a resident of Oregon if they are domiciled in Oregon, unless that person meets all of the requirements of ORS 316.027(a)(A)(i) to (iii). A person may also be an Oregon resident if that person is not domiciled in Oregon but nonetheless maintains a permanent place of abode in this state and spends 200 days in a given taxable year in this state. ORS 316.027(a)(B). The department and taxpayer both appear to agree that ORS 316.027(a)(B) is inapplicable in this case, as are ORS 316.027(a)(A)(i) to (iii). Therefore, the question of whether taxpayers were residents of Oregon

in 2006 turns entirely on whether taxpayers were domiciled in Oregon in 2006.

The statutes do not provide a definition of "domicile." However, that term is commonly defined as:

> "The place at which a person is physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere."

*Black's Law* Dictionary 523 (8th ed 2004). A domicile differs from a residence in that a person may have many residences, but they can only have one domicile. *Zimmerman v. Zimmerman*, 175 Or 585, 591, 155 P2d 293 (1945). A person's domicile remains that person's domicile until that person establishes a new domicile at a different location. *Davis v. Dept. of Rev.*, 13 OTR 260, 264 (1995). A person is "domiciled" in Oregon if that person's domicile is located within the boundaries of this state.

Domicile is a question of fact that taxpayer has the burden of proving by a preponderance of the evidence. ORS 305.427. Because the criteria governing domicile are unavoidably subjective, the court cannot simply rely on the potentially self-serving testimony of the person or persons concerned; the question must be answered by reference to the objective circumstances and the overt acts of the person or persons at issue. *Hudspeth v. Dept. of Rev.*, 4 OTR 296, 298 (1971).

Taxpayers have residences in Coloma, California; in Ashland, Oregon; in Italy; and in Iowa. Taxpayers' longest-standing residence is their house in Coloma, California, which the court understands taxpayers have owned since 1973. However, taxpayers acquired their Ashland residence only a short time thereafter, and taxpayers had significant business, social, and family ties in both Oregon and California. The record is clear that taxpayers were physically present at each of their residences during the 2006 tax year.

The department argues that taxpayers established their house in Ashland as their domicile no later than 2001, and retained their Oregon domicile through at least the end

of 2006. The department points to the fact that in 2001 taxpayers registered to vote in Oregon, obtained Oregon driver's licenses, surrendered their California driver's licenses, began filing Oregon full-year resident income tax returns, and began filing California state income tax returns as nonresidents. Taxpayers argue that their changes in voter registration were not intended to indicate an intention to change domicile and that their filing of full-year resident Oregon income tax returns was an error on the part of their accountant.

Neither of taxpayers' arguments is well taken. As an initial matter, taxpayers filed full-year resident Oregon and nonresident California income tax returns not just once, but over a course of several years. Taxpayers did nothing in the course of those several years to correct the supposed error, suggesting that taxpayers at that time wished to file in that manner.

Similarly, while taxpayers may not truly have intended to abandon their California domicile in favor of one in Oregon, taxpayers' acts of surrendering their California driver's licenses, obtaining Oregon driver's licenses, and registering to vote in Oregon are precisely the sort of overt acts that the court must consider in determining taxpayers' probable intentions at the time. Those overt actions clearly undermine taxpayers' claims regarding their domicile in 2006.

The record shows that taxpayers had substantial connections to Oregon in the years leading up to 2006. In 2006 itself, taxpayers spent, according to their own accounting, 91 days in this state; somewhat less than the number of days taxpayers spent in California (131) or Italy (120), but nonetheless a significant proportion of the year. Taxpayers' 2006 federal and Oregon income tax returns both indicate their Ashland address as their primary address, as do several of their bank statements. Taxpayers also indicated their Ashland address as their primary address on several of the documents submitted by taxpayers to substantiate their travel expenses in 2006. That evidence further substantially undermines taxpayers' case that their house in Coloma was their domicile in 2006.

As was stated above, the court gives substantial weight to taxpayers' registration to vote in Oregon and possession of Oregon-issued driver's licenses. In past cases dealing with domicile, this court has held that when a taxpayer has the burden of proving by a preponderance of the evidence that a taxpayer is no longer a resident of Oregon, possession of a driver's license issued by another state or voter registration in another state may not be enough to satisfy the burden of proof if a taxpayer nonetheless retains substantial ties to Oregon. *See Dane v. Dept. of Rev.*, 21 OTR 15 (2012). That ruling does not alter the principles underlying that opinion. Where, as here, however, taxpayers have the burden of showing that they were not domiciled in Oregon *despite* possessing Oregon driver's licenses, being registered to vote in Oregon elections, and filing taxes as full-year residents of Oregon, taxpayers have a very heavy burden to carry. The evidence presented by taxpayers falls far short of satisfying that burden.

2.  *Whether Taxpayers' Zoex Garment Activities Were Pursued for Profit*

The department denied certain deductions claimed by taxpayers on the ground that taxpayers' Zoex activities were "not engaged in for profit" within the meaning of IRC section 183. ORS 316.048 incorporates the provisions of the federal Internal Revenue Code for purposes of determining Oregon Income Tax liability, except where the Legislative Assembly has adopted specific exceptions. No such exceptions are implicated in this case, so the court will apply the provisions of the Internal Revenue Code throughout this opinion using the same rules of construction as would a federal court applying the same law to the same facts.

IRC section 183(c) defines an "activity not engaged in for profit" as any activity for which deductions are not allowed under IRC section 162 (covering "ordinary and necessary expenses *** in carrying on any trade or business"), under IRC section 212(1) ("all the ordinary and necessary expenses paid *** for the production or collection of income"), or under IRC section 212(2) ("all ordinary and necessary expenses paid *** for the management, conservation, or maintenance of property held for the production of income").

A taxpayer pursuing an "activity not engaged in for profit" may take certain deductions that are allowed regardless of whether that taxpayer's activity is engaged in for profit. IRC § 183(b)(1). Such taxpayer may also take deductions that would be allowed for an activity that is engaged in for profit, but only to the extent that taxpayer's gross income from the "activity not engaged in for profit" exceeds the deductions allowed to that taxpayer under IRC section 183(b)(1). IRC § 183(b)(2).

In this case, taxpayers did not claim any deductions under IRC section 183(b)(1), and did not have any gross income from their Zoex activities in 2006. The amount of deductions allowable for taxpayers' Zoex activities in 2006 therefore hinges on whether or not taxpayers' Zoex activity was an "activity not engaged in for profit" in 2006.

The department contends that taxpayers' Zoex activity was an "activity not engaged in for profit" in 2006. Many of the adjustments made by the department to taxpayers' Oregon income tax return relied at least in part on that determination. Taxpayers meanwhile contend that their Zoex activities were pursued for profit in 2006 and point to their substantial income in years 2008-2010 as evidence that they were engaged in a for-profit activity in 2006. (Ptfs' Post Trial Memo at 6.)

The department relies on the non-exclusive list of factors found in Treasury Regulations section 1.183-2(b) to support its position. These factors include:

(1) The manner in which taxpayers carried out the activity;

(2) The expertise of taxpayers or their advisors;

(3) The time and effort expended by the taxpayers in carrying on the activity;

(4) Expectation that assets used may appreciate in value;

(5) The success of the taxpayers in carrying on similar or dissimilar activities

(6) The taxpayers' history of income or losses with respect to the activity;

(7)   The amount of occasional profits, if any, which are earned;

(8)   The financial status of the taxpayer; and

(9)   Elements of personal pleasure or recreation.

This is a nonexclusive list and the regulation itself admonishes against any formulaic application of the factors listed. *See* Treas Reg § 1.183-2(b). However, the list does broadly take in the salient features of an activity deliberately and conscientiously pursued for profit, as opposed to one pursued for other purposes. In this case, the court finds particularly probative factors 1, 4, 6, 8, and 9.

With regard to the first factor, taxpayers appear to have carried out their Zoex activities rather casually. Taxpayers had an unspecified business relationship in the 1990s with Zoex Corporation and had an ongoing relationship at the time of trial with Dr. Richard Pellagra, the principal of that corporation. Taxpayer Sheri Hillenga testified to the effect that taxpayers engaged in their Zoex activities pursuant to an oral agreement with Dr. Pellagra, but was unable to articulate the terms of this agreement or what taxpayers gave to Dr. Pellagra as consideration. Taxpayers were also unable to provide any business records relating to their Zoex activities from 1990 through 2003, and provided only cursory summaries of receipts and expenses for 2004 and 2005. All of this suggests that taxpayers did not keep detailed records of their Zoex-related transactions. This casual approach to keeping records of business arrangements, income, and expenses is not suggestive of an activity carried out primarily for profit.

With regard to the fourth factor, taxpayers' Zoex activities did not involve any asset of taxpayers that could be expected to appreciate in value through taxpayers' efforts. While they appear to have had a hand in the development of the Zoex garment, taxpayers do not claim to have invented the Zoex garment or to own any of the underlying intellectual property. Taxpayers stood to gain not from appreciation in the value of any of the assets associated with their Zoex activities, but rather through their sales of Zoex units. Taxpayers' track record in selling Zoex units, however, was not one to inspire confidence as of 2006.

This leads to the sixth factor listed above: taxpayers' history of income and losses from Zoex activity. Taxpayers have been unable to produce any records of income or expenses from their Zoex activities prior to 2004. Given that taxpayers must satisfy the burden of proof on the issue of whether taxpayers' pursued their Zoex activities for profit in 2006, the absence of records pertaining to sales in those years must be read as evidence of an absence of such sales. ORS 305.427. Taxpayers reported $11,196 in gross income from their Zoex activities in 2004, but did not claim any revenue from their Zoex activities in 2005 or 2006. In other words, taxpayers have shown only one year of modest income from their Zoex activities from 1990 through 2006. Taxpayers' persistence in this activity despite so many nonremunerative years of effort weighs against a conclusion that taxpayers pursued their Zoex activities for profit during this period.

With regard to the eighth factor, taxpayers' financial status in 2006 further indicates that taxpayers' Zoex activities were not pursued for profit. The regulations implementing IRC section 183 recognize that "substantial income from sources other than [the activity in question] (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit, especially if there are personal or recreational elements involved." Treas Reg § 1.183-2(b)(8). Here, taxpayers reported substantial income from their design proposal business in 2006 and in the years that we have records for leading up to 2006, coupled in each year with either no income or very little income from their Zoex activities—but substantial alleged business expenses for travel, lodging, and meals. Those alleged business expenses, if upheld, represent a substantial tax benefit to taxpayers and—in the absence of substantial income from taxpayers' Zoex activities—weigh against concluding that those activities were engaged in for profit.

The travel, lodging, and meals aspects of taxpayers' Zoex activities likewise speak to the ninth factor cited by Treasury Regulations section 1.183-2(b). Taxpayers testified that they marketed Zoex by travelling to conventions of various sorts and "cold-calling" various responsible individuals

at military bases, ski resorts, and other locations throughout the world. The court would normally be cautious about passing judgment on particular marketing techniques as indicative that taxpayers were not pursuing their Zoex-related activities on a for-profit basis; however, in light of the absence of evidence of any sales resulting from these techniques during the period from 1990 through 2003, and the sporadic nature of taxpayers' sales from 2004 through at least 2006, this aspect of taxpayers' Zoex activities suggests that profit was not taxpayers' primary motivation for the activity.

Taxpayers have placed in the record extensive evidence of travel expenditures that taxpayers claimed as business expenses arising from their Zoex activities. But little, if anything, in the record substantiates the relationship between these travel expenditures and taxpayers' Zoex activities. In certain instances, as the department points out, those expenses appear to coincide with dates that the record shows manifestly personal reasons for taxpayers to be travelling. The presence of these coincidences suggests that taxpayers may have been using their Zoex-related activities as an opportunity to attribute otherwise personal expenses to business.

Taxpayers attempted to prove that their Zoex activities were pursued for profit in 2006 by pointing to taxpayers' significant profits from sales of Zoex garments in 2008 and later years. This argument is not well taken. Taxpayers may have pursued their Zoex activities as a for-profit activity in years subsequent to 2006, but in light of the preceding analysis of the factors identified in the Treasury Regulations, taxpayers have a heavy burden to carry in showing that the many years of substantial expenses from their Zoex activities without evidence of income were part of a considered strategy to eventually produce profit.[2] The evidence in the record for such a conclusion is lacking, and the evidence to the contrary is quite persuasive.

---

[2]  Indeed, the tests for determining whether an activity was pursued for profit in a given year are all retrospective. *See, e.g.*, IRC § 183 (activity presumed for profit when gross income from the activity exceeds deductions permitted under IRC section 183(b)(1) in three of the five years ending with the year at issue); Treas Reg 1.183-2(b) (the nine non-exclusive factors discussed above).

Taxpayers' Zoex garment activity was not pursued for profit in 2006. As a result, expenses in 2006 arising from that activity are deductible only to the extent that taxpayers' gross income from those activities exceeds the deductions taxpayers would be allowed regardless of whether or not they engaged in their Zoex activities for profit. *Cf.* IRC § 183(b)(1), (2). As was stated above, taxpayers did not claim any deductions under IRC section 183(b)(1) in 2006, and also did not have any gross income from their Zoex activity. Taxpayers therefore may not deduct expenses arising from their Zoex activities.

3. *Business Use of Taxpayers' Home in Coloma, California*

On their 2006 Oregon income tax return, Taxpayers claimed that they used 2500 square feet in their home in Coloma, California, "regularly and exclusively" for business use. Taxpayers state the overall square footage of their house in Coloma as 3000 square feet.[3] The areas claimed as used regularly and exclusively for business purposes included the hallway leading to taxpayers' bedroom and one of the two bathrooms on the main floor of the Coloma house. Sheri Hillenga's testimony on direct examination did little, if anything, to bear out these representations. Further, on cross-examination the department succeeded in showing that at least one area claimed for exclusive business use—the "upstairs office" added to the house in 2002—appeared to have been used to store non-business-related personal property, in addition to whatever business purpose the area may have served. As a result, the court gives very little weight to the representations of taxpayers on this issue.

One further defect in taxpayers' argument, however, obviates the need to further investigate the extent of taxpayers' use of their Coloma house for exclusively business purposes. IRC section 280A(c)(1) permits deductions for

---

[3] In a separate accounting submitted as an exhibit at trial, taxpayers state the square footage of their Coloma house at 3,118 square feet, with 2,552 square feet used exclusively for business use. The court understands the disparity arises from including closet space in the exhibit that was not counted on taxpayers' return.

expenses relating to portions of a dwelling unit "exclusively used on a regular basis" in one of three ways:

"(A)   as the principal place of business for any trade or business of the taxpayer,

"(B)   as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or

"(C)   in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business."

Taxpayers do not state which of these three descriptions, in their view, apply to the portions of their house in Coloma that are supposedly used exclusively for business purposes. One of taxpayers' exhibits mentions a roughly 180-square-foot "separate storage area" that taxpayers claim is used for business purposes. However, taxpayers did not present any evidence about that building at trial and the record does not contain information that the court could use to allocate any expenses to that structure. In addition, though the diagram provided by taxpayers of the floor plan of taxpayers' Coloma residence does designate one room as a "conference room," the record does not contain any evidence that taxpayers regularly and exclusively used any part of their Coloma residence to meet with clients or customers. Therefore, the only remaining avenue for taxpayers to deduct expenses relating to their use of the Coloma house for business purposes is if some portion of the Coloma house is taxpayers' "principal place of business" under IRC section 280A(c)(1)(A).

IRC section 280A(c)(1) defines "principal place of business" as:

"[A] place of business which is used by the taxpayer for the administrative or management activities of any trade or business of the taxpayer *if there is no other fixed location of such trade or business where the taxpayer conducts substantial administrative or management activities of such trade or business.*"

(Emphasis added.) The court sees no reason to doubt that taxpayers used at least some portion of the Coloma house to conduct management and administrative activities related

to their design proposal business. However, the court sees substantial reasons to doubt that the Coloma house was taxpayers' "principal place of business" for purposes of IRC section 280A(c)(1) during 2006.

The main issue is the requirement in IRC section 280A(c)(1) that there be "no other fixed location * * * where the taxpayer conducts substantial administrative or management activities" of the trade or business. The record indicates that taxpayers largely split their time in 2006 between California, Italy, and Oregon. The record also indicates that taxpayers conduct much of their design proposal business remotely and that taxpayers themselves were the only individuals employed in their sole proprietorship in 2006—aside from occasional help from a son living in the vicinity of Santa Cruz, California.

Lastly, the record contains extensive evidence that taxpayers maintained at least one other home office at their residence in Ashland. The record indicates at a minimum that taxpayers conducted much of their Zoex-related business from this location, but inasmuch as taxpayers' office in Ashland appears to have been equipped with computers and other standard office equipment, taxpayers have the burden of affirmatively showing that they did not conduct "substantial administrative or management activities" of their design proposal business from Ashland. Nothing in the record dispels this possibility, and some of the documents and testimony offered by taxpayers suggest the opposite conclusion. Under these circumstances, taxpayers have failed to satisfy the burden of proof by showing that they regularly and exclusively used portions of their home in Coloma as the principal place of business for their design proposal business.

Taxpayers have thus failed to prove that any portion of their house in Coloma is "regularly and exclusively used" for a qualifying business purpose under IRC 280A, and may not deduct as business expenses any costs related to utilities or upkeep of that home.

B. *The Adjustments to Taxpayers' 2006 Income and Deductions*

The preceding analysis sets the stage for the remainder of this opinion. As was stated above, the department

made numerous adjustments to the income reported and deductions allowed on taxpayers' 2006 Oregon income tax return. The department now concedes that one such adjustment—requiring taxpayers to recognize the full $196,591 reported on taxpayers' 2006 form 1099-MISC from Space Systems/Loral, rather than the $180,334 initially reported as gross receipts on taxpayers' 2006 Schedule C— was incorrect. The court will address the remaining adjustments to taxpayers' Schedule C in the order presented in the post-trial briefs of the parties.

1. *Allowance of "Cost of Goods Sold" for Purchases of Zoex Garments*

As was stated above, taxpayers reported $180,334 of gross receipts on taxpayers' Schedule C. Taxpayers offset against these receipts $119,067 in cost of goods sold (CoGS). At conference the department allowed only the $114,383 of CoGS directly related to taxpayers' design proposal business; the department denied the $4,684 that taxpayers claimed as CoGS for purchases of Zoex units in 2006 for subsequent resale by taxpayers. The department denied taxpayers' CoGS for their Zoex purchases on the ground that taxpayers did not sell any of the Zoex garments that taxpayers purchased in 2006.

The department's position is well taken. When a taxpayer is engaged in manufacturing or retailing goods, CoGS is used to offset receipts from the eventual sale of goods. Treas Reg § 1.61-3. Gross income from retail or manufacturing activity is the excess of receipts over CoGS. *Id.* IRC section 471 and its implementing regulations require manufacturers and retailers to produce beginning and end-of-year inventories to accurately relate CoGS to receipts—and thus gross income—for a given year. Treas Reg § 1.471-1. Alternatively, taxpayers using the Cash-Disbursements method of accounting (the cash method) and with less than $1 million in annual sales may forgo the inventory-taking requirements imposed by the regulations and instead deduct CoGS for a given unit of goods in the year that the unit is actually sold. *See* Rev Proc 2001-10, 2001-2 IRB 272. In any event, CoGS is taken only when it can be used to offset receipts as part of determining gross income from sales of goods.

Taxpayers did not establish any receipts arising from their Zoex activities in 2006 and Sheri Hillenga testified at trial that taxpayers did not succeed in selling any Zoex garments in that year. Because taxpayers had no receipts from their Zoex activities to offset in 2006, taxpayers may not claim CoGS for their purchases of Zoex garments in 2006. The denial of taxpayers' Zoex-related CoGS for 2006 is sustained.

2.   *Schedule C Car and Truck Expenses*

Taxpayers sought to deduct as business expenses certain costs relating to their use of owned and rented vehicles for business purposes. The department denied these deductions for failure to substantiate the business nature of these expenditures.

IRC section 274(d) reads, in pertinent part:

"No deduction or credit shall be allowed—

"(1)   under section 162 or 212 for any travelling expense (including meals and lodging while away from home),

"(2)   for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity,

"(3)   for any expense for gifts, or

"(4)   with respect to any listed property (as defined in section 280F(d)(4)),

"unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility *** , (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of the persons entertained, using the facility or property, or receiving the gift."

The department correctly points out that passenger automobiles are "listed property" under IRC section 280F(d)(4) and are therefore subject to the substantiation requirements of IRC section 274(d).

Taxpayers have provided detailed records showing the amounts and dates of their 2006 vehicle expenses, including invoices from mechanics and from vehicle rental services in both the United States and Europe. However, taxpayers have offered nothing from which the court can reconstruct a history of the business use of such vehicles over the course of 2006. Taxpayers' handwritten calendar for 2006 gives some sense of the various business appointments taxpayers had that year, but does not indicate what vehicle or vehicles taxpayers may have used on any given day, or the extent of such use for specifically business purposes. Sheri Hillenga's testimony at trial on this subject—even when combined with taxpayers' calendar—is not an adequate equivalent for an "account book, diary, log, statement of expense, trip sheets or similar record * * * made at or near the time of the expenditure" called for in the regulations implementing IRC section 274(d). *See* Treas Reg § 1.274-5T(c)(2). The single-page summary of mileage and maintenance expenses for each vehicle provided by taxpayers likewise does not purport to be a contemporaneous record and lacks the specificity needed to corroborate taxpayers' claims that these expenses were accrued in the course of using the vehicles in question for business purposes.

Taxpayers have failed to substantiate the business purpose of their vehicle-related expenses "by adequate records or sufficient evidence." Taxpayers' claimed deductions for such expenses are therefore denied.

3.   *Schedule C Depreciation*

Taxpayers claimed depreciation for vehicles, computers, improvements to their house in Coloma, and furniture used at their house in Coloma.

Taxpayers' claims for depreciation on the vehicles that taxpayers allegedly used in their Schedule C business are denied for the same reason that taxpayers' claimed deductions for vehicle-related expenses are denied. IRC section 274(d) states "no deduction * * * shall be allowed" for listed property in the absence of adequate substantiation of the business use of such property. Taxpayers have failed to adequately substantiate the business use of their vehicles, and so cannot deduct depreciation on those vehicles.

With regard to taxpayers' computers, the department correctly points out that taxpayers' computers are "listed property" subject to the substantiation requirements of IRC section 274(d).[4] Taxpayers have made no effort to meet these substantiation requirements and thus are properly denied a deduction for depreciation relating to their computers.

Taxpayers' deductions for depreciation for their house in Coloma and for furniture in their house in Coloma are likewise denied because, as discussed above, taxpayers have failed to show that any part of their house in Coloma, including the "upstairs office" addition that they specifically seek depreciation for, is regularly and exclusively used for a qualifying business purpose under IRC section 280A.

4.  *Schedule C Insurance*

Taxpayers claimed $1,910 in business-related insurance premiums for 2006. At conference the department allowed as a deduction only $231, representing half of taxpayers' premium on their personal liability policy, and denied the rest for lack of substantiation. At trial and in their subsequent briefing taxpayers accepted this division with regard to their personal liability insurance premium, but argued that at least one additional insurance premium—covering their office equipment and computers—should also be allowed as a deduction. Taxpayers did not, however, offer any evidence at trial to substantiate further deductions for insurance expenses beyond those already allowed by the department at conference. Therefore, any additional deductions for business-related insurance premiums in 2006 are denied.

5.  *Schedule C Legal and Professional*

Taxpayers conceded this issue in their post-trial briefing.

---

[4] Computers are "listed property" unless exclusively used in a "regular business establishment." IRC § 280F(d)(4)(B). Where, as here, the computers in question are located in a personal home, they are listed property unless located in a portion of the home that satisfies the terms of IRC section 280A(c)(1). *Id*. Taxpayers have failed to show that any portion of their house in Coloma satisfies the terms of IRC section 280A(c)(1), and do not present any other arguments for the proposition that their computers fall outside the substantiation requirements of IRC section 274(d).

### 6.  *Schedule C Office Expenses*

Taxpayers claimed $9,219 of office expenses for their business in 2006. The department allowed $583 at conference. Taxpayer now argues that roughly $3000 of the disallowed office expense should be permitted as arising from the business use of taxpayers' Coloma house.

This amount is denied because, as stated above, taxpayers have not carried the burden of proving that any portion of taxpayers' house expenses may be deducted consistent with IRC section 280F. With regard to the rest of the disallowed amount, taxpayers have not provided evidence from which the court could determine that any amount greater than that allowed by the department at conference should be allowed, and has therefore failed to carry the burden of proof on this issue.

### 7.  *Schedule C Supplies*

Taxpayers claimed $3,910 of business-related expenses for supplies in 2006. The department initially allowed only $638 as a deduction, but at conference increased the amount allowed to $1,031. Taxpayers appear to allege in their briefing that additional amounts should be allowed, and point to certain documents submitted as exhibits by the department as showing additional items purchased as business supplies. However, the documents taxpayers point to are, for the most part, merely copies of receipts from general retail chain stores showing that taxpayers purchased certain items. Taxpayers concede in their briefing that many of these receipts contain both business supplies and items for personal use, but provide little useful guidance to the court for telling the one from the other. The court's own inspection of these documents suggests that a very large proportion of the items purchased are susceptible to both business and personal use.

Taxpayer has not satisfied the burden of proof on this issue and no further deduction is allowed beyond what the department allowed at conference.

### 8.  *Repairs and Maintenance*

Taxpayer claimed $3,052 of repairs and maintenance expenses on their 2006 Schedule C. These expenses

relate to repairs to their house in Coloma. In their post-trial brief taxpayers insist that the repairs are deductible, but concede that they should be accounted for as expenses arising from the business use of their Coloma house.

As stated above, however, the court has concluded that taxpayers' representations concerning the business use of their Coloma house are not credible as initially presented, and taxpayers have not presented evidence from which the court could conclude that some discrete portion of taxpayers' Coloma house was regularly and exclusively used in any fashion provided for under IRC section 280A(c)(1). Therefore, no deduction is allowed for the repairs to taxpayers' Coloma house in 2006.

9. *Schedule C Travel and Lodging*

Taxpayers claimed $17,250 of travel expenses as a deduction in 2006. This sum represents $5,871 in auto rental costs, $1,257 in lodging, and $10,121 in airfare to Italy, Iowa, and other locations. At trial Sheri Hillenga testified that these expenses were all attributable to taxpayers' marketing of Zoex garments. Inasmuch as this court has already concluded that taxpayers' Zoex garment activities were not pursued for profit in 2006, taxpayers may deduct travel expenses arising from taxpayers' Zoex activities only to the extent that taxpayers' gross income from their Zoex activities exceeded the deductions allowed under IRC section 183(b)(1). Taxpayers did not claim any deductions under IRC section 183(b)(1) and did not have any gross income from their Zoex activities in 2006. Taxpayers therefore may not deduct travel and lodging expenses for 2006 arising from their Zoex activities.

10. *Schedule C Meals and Entertainment*

Taxpayers claimed $2,382 in deductible business-related meals and entertainment expenses. Neither at trial nor in their briefing have taxpayers made any effort to substantiate the business nature of these expenses. The deduction is therefore denied.

11. *Schedule C Utilities*

Taxpayers claimed $3,052 of utilities as a deduction on their 2006 Schedule C. However, taxpayers did not

attempt to substantiate this amount at trial or even to address the issue in their post-trial briefing. The deduction is therefore denied.

12.    *Schedule C "Other Expenses"*

Taxpayer claimed $6,031 in deductions for business related "other expenses" on their 2006 Schedule C. These included $850 for accounting services, $70 for bank charges, $436 for delivery and freight, $63 for parking and tolls, $208 for pest control at their Coloma house; $1,061 for postage, $572 for security expenses for one of their properties in Oregon; and $2,771 for telephone service. At conference the department allowed taxpayers' accounting and postage expenses in the amounts claimed, reduced the amount allowed for phone service to $1,200, and denied the rest of taxpayers' claimed deductions in this category.

In their post-trial briefing taxpayers conceded that the deductions for parking and tolls are duplicative—those expenses were also claimed as deductions for travel expenses—but nonetheless argued that the amounts for pest control and security should be allowed, and that the amount allowed for phone service should be restored to $2,771.

Taxpayers argue that the pest control expenses arise from the business use of their home in Coloma. The deduction for this expense is denied because taxpayers have failed to carry the burden of showing that any portion of the expenses associated with their home in Coloma may be deducted consistent with IRC section 280A.

Taxpayers argue that their security expenses were for one of their rental properties in Oregon. The department argues that the expense was for their personal residence in Ashland—not a rental property—and that taxpayers did not offer any evidence to substantiate the amount of the expense. The department's position is well taken. In the absence of evidence substantiating the amount and nature of this expense, the court denies this deduction.

Taxpayers argue that the deduction for telephone service allowed by the department fails to reflect taxpayers' business use of their phones. Taxpayers refer the court to statements by taxpayers to the effect that taxpayers subscribe

to only basic land-line phone service at their residences, use calling cards to pay for long distance calls while travelling, and use their cellular phones only for business purposes.

The department correctly points out that pursuant to IRC section 262(b) basic telephone service on a first telephone line to an individual's residence is *per se* a nondeductible personal expense. The department also correctly points out that cellular phones are listed property under IRC section 280F(d)(4)(A)(v). Taxpayers must therefore substantiate the amount of use of their cellular phones, the time and place of such use, and the business nature of such use, as with passenger automobiles and personal computers claimed for business use. Taxpayers have offered nothing that would permit the court to establish these elements for taxpayers' cell phone usage.

While the court does not doubt that taxpayers had some amount of legitimately deductible expense for telephone service in 2006, taxpayers have presented no evidence to substantiate the amount of any such deduction.

C.  *Interest Income*

At conference the department increased taxpayers' interest income from the $12,345 reported on their 2006 Form 1040 to $25,845. That increase arose from interest reported on a 1099-INT statement addressed to taxpayers' sole proprietorship.

Taxpayers did not address that issue in their posttrial briefing, but appear to take the position that the interest income in question was not received by taxpayers personally, but rather by a profit sharing plan, as defined under IRC section 401. In support of that position, taxpayers put in the record a letter from taxpayers' bank to Sheri Hillenga purporting to show that the Certificates of Deposit (CD) that accrued the interest income in question were all owned by either Sheri Hillenga or Mike Hillenga as beneficiaries of the VMH Visual Communications Profit Sharing Plan. The department, however, points to a number of inconsistencies tending to contradict taxpayers' representations about the ownership of the CDs at issue and the disposition of the interest income from those CDs.

The department particularly points to a 1099-INT statement covering the CDs at issue that taxpayers' bank issued to taxpayers' sole proprietorship in 2006. The 1099-INT undermines taxpayers' argument on this point for three reasons: first, profit sharing plans—known alternatively as "HR 10" or "Keogh" plans—are exempt from 1099-INT reporting. *See* IRC § 6049(b)(2)(B). Second, the 1099-INT statement specifically identifies the income from the CDs as "taxable interest paid to" taxpayers' sole proprietorship. Third, the 1099-INT in several places identifies the recipient of the income from the CDs as taxpayers' sole proprietorship, rather than a profit sharing plan.

The 1099-INT statement reporting the interest income, much less the reporting of said income as taxable interest income to taxpayers' sole proprietorship, conflicts with taxpayers' representations about the ownership of the CDs and the nature of the interest income. Taxpayers make no effort in their post-trial brief to reconcile their representations to the seemingly countervailing circumstantial evidence. Taxpayers have also not sought to place in the record, for instance, evidence that taxpayers' bank issued the 1099-INT in error or informational returns for 2006 showing that taxpayers' HR 10 plan received the interest income from the CDs at issue.

Taxpayers have the burden of proof on this issue and the evidence is, at best, in equipoise. Under these circumstances the department's adjustment to taxpayers' return so as to include the interest income from the CDs covered by the 1099-INT must stand. ORS 305.427.

D.  *Taxpayers' Net Operating Loss Carryforward*

Taxpayers reported on their 2006 Form 1040 a Net Operating Loss (NOL) carryforward of $9,547. This carryforward arose from an NOL of $11,719 claimed on taxpayers' 2004 income tax return. Taxpayers could not initially utilize this NOL carryforward on their 2006 return because, as originally filed, taxpayers' 2006 income tax return reflected negative taxable income. The question now arises, in light of the adjustments to taxpayers' returns made by the department and upheld by the court in this opinion, what amount,

if any, of that NOL carryforward taxpayers may utilize to reduce their 2006 Oregon income tax liability. As mentioned above, the department raised this issue as a counterclaim in its Answer and therefore it bears the burden of proof. ORS 305.427.

The department argues that taxpayers should be denied use of the NOL carryforward because, in light of what the department and the court now know about the deductions claimed on taxpayers' 2006 returns, some of the deductions claimed on taxpayers' 2004 income tax return likely should have been denied. The department particularly points to taxpayers' inability during discovery to produce documents substantiating various deductions claimed on their 2004 return. In the department's view, although the department bears the statutory burden of proof regarding the NOL carryforward, taxpayers now have the burden of going forward with evidence concerning the 2004 NOL itself.

The court disagrees. ORS 314.410(1) normally limits the period for issuing a notice of deficiency to three years. ORS 314.410(2) extends that period of limitations to five years in the event of a greater than 25 percent understatement of gross income. Longer periods of limitation apply in other circumstances, but the department neither pleads nor argues that such circumstances are present in this case.

If the department questioned the accuracy of taxpayers' 2004 return, the time to raise those questions was within the limits set by ORS 314.410. As it stands, the department's conference officer originally allowed taxpayers' NOL carryforward for 2006, but ruled that it was entirely consumed by taxpayers' 2006 tax liability. In its counterclaim the department argued that this decision by the conference officer was incorrect. However, in light of the limitations imposed by ORS 314.410 and the inability to now revisit taxpayers' 2004 return, court concludes that the conference officer properly allowed the NOL carryforward.

The department appears to argue that the court has the authority to reopen the 2004 tax year pursuant to ORS 305.575. This position is mistaken. ORS 305.575 permits

the court to reach a conclusion as to the correct amount of a deficiency in an appeal of an assessment regardless of the amounts pleaded by the parties in that particular appeal; it does not declare open season to revisit closed tax years that are not at issue in the present appeal.

As was stated above, the department raised this issue as a counterclaim and therefore it has the burden of proving its case by a preponderance of the evidence. ORS 305.427. The department has failed to carry the burden of proving that taxpayers are not entitled to carry forward their NOL from 2004 on their 2006 Oregon income tax return.

E.  *Penalties*

The department imposed three separate penalties on taxpayers' 2006 return: a 20 percent penalty provided for under ORS 314.402 for substantial understatement of taxable income (SUI); a 25 percent penalty for noncompliance with the terms of the tax amnesty provided for in Oregon Laws 2009, chapter 710 (SB 880 (2009))[5]; and a 5 percent late payment penalty provided for under ORS 314.400(1). Taxpayers do not appear to dispute the late payment penalty, but argue that the SUI penalty and the post-amnesty penalties should be reduced or eliminated.

The SUI penalty applies to noncorporate taxpayers when the taxpayer understates that taxpayers' taxable income by $15,000 or more. ORS 314.402(2)(a). Taxpayers' argument regarding the SUI penalty necessarily follows on from taxpayers' positions on the department's adjustments to taxpayers' 2006 income tax return: if the adjustments by the department had been incorrect, as taxpayers argued, taxpayers' 2006 income tax return would then have accurately reflected taxpayers' 2006 taxable income. Because the adjustments upheld by the court increase taxpayers' taxable income for 2006 by substantially more than $15,000, the SUI penalty stands.

---

[5]  Though passed by the legislature and signed into law by the governor, the text of SB 880 (2009) was never made a permanent part of the ORS. The relevant provisions of SB 880 (2009) are found in chapter 314 of the 2009 edition of the ORS, following the text of ORS 314.469.

The post-amnesty penalty is required by the terms of SB 880 (2009). That statute provided for the department to operate a temporary tax amnesty program from October 1, 2009, through November 19, 2009. The amnesty was to be limited to "tax years, reporting periods, and estates for which the department could issue a notice of deficiency" as of September 28, 2009. SB 880 (2009) § 1. Taxpayers who were eligible for the amnesty but who failed to apply and either (a) failed to file a return for one of the years subject to the amnesty, or (b) filed a return for a year subject to the amnesty, but failed to report or underreported tax liability for such year, were to be punished by the addition of a penalty amounting to 25 percent of their total tax liability for the year in question. SB 880 (2009) § 4.

2006, the only year at issue in this case, was a tax year "for which the department could issue a notice of deficiency" as of September 28, 2009. ORS 314.410. While there is no dispute that taxpayers did file an income tax return for 2006, the analysis up to this point clearly shows that taxpayers' 2006 Oregon income tax return understates their income tax liability for that tax year. The post-amnesty penalty is therefore sustained.

Taxpayer argues that the post-amnesty penalty should be removed because, in taxpayers' view, the department never clearly communicated to taxpayers that they were eligible for the amnesty. This argument fails. The record shows that an employee of the department discussed the amnesty program with Sheri Hillenga on October 2, 2009, and that Sheri Hillenga, acting on behalf of taxpayers, expressed disinterest in the program. Taxpayers make no effort to show why this lack of interest should be imputed to the department—taxpayers do not, for instance, allege that they detrimentally relied on incorrect statements about the amnesty program by the department employee. Consequently, the post-amnesty penalty stands.

F.  *Taxpayers' Kicker Rebate*

Taxpayers and the department both concur that taxpayers' "Kicker" rebate for 2006 will need to be recalculated in light of the court's rulings in this opinion. That amount should reflect department's concession as to the

funds owed to taxpayers in 2006 but only received in 2007, and the court's rulings regarding taxpayers' claimed deductions, NOL carryforward, and penalties.

## V.   CONCLUSION

Now, therefore,

IT IS THE DECISION OF THIS COURT that the court concludes the following:

(1)   Taxpayers were domiciled in Oregon in 2006;

(2)   Taxpayers' Zoex garment activities were not pursued for profit in 2006;

(3)   Taxpayers have not satisfied the burden of showing that they "regularly and exclusively" used any portion of their house in Coloma, California, for a qualifying business purpose under IRC section 280A;

(4)   The adjustments by the department to taxpayers' Schedule C, except for the department's concession regarding the payment taxpayers received in 2007 for work done in 2006, were proper;

(5)   Taxpayers failed to satisfy the burden of showing that the interest income reported on their 1099-INT accrued to an HR 10 Profit Sharing Plan, rather than to taxpayers personally;

(6)   Taxpayers are entitled to carry forward their 2004 NOL on their 2006 Oregon income tax return;

(7)   The department properly levied penalties against taxpayers; and

(8)   The amount of taxpayers' "Kicker" rebate shall be recalculated in accordance with these rulings.