IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| DICK E. HANSON and CAROL J. HANSON, | ) ) ) | |
| Plaintiffs, | ) ) | TC-MD 190010G |
| v. | ) ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) ) | |
| Defendant. | ) | **DECISION** |

This case is ready for decision after trial on the issue of whether activity reported on

Plaintiffs' Schedule C was conducted for profit. Plaintiffs appealed from Defendant's

Conference Decision Letter. Plaintiff Dick E. Hanson (Pastor Hanson) appeared and testified on

behalf of Plaintiffs. James Bartos, Tax Auditor, appeared and testified on behalf of Defendant.

Plaintiffs' exhibits 1 to 14, 2A, 2B, 3A, 3B, 4A, 7A, and 9A were admitted without objection.

Defendant's exhibits A to E, the odd-numbered pages of its exhibit F, and its exhibits G to I were

admitted without objection. Page 6 of Defendant's exhibit F was admitted on rebuttal.

## I. STATEMENT OF FACTS

Pastor Hanson is an entrepreneur, a business owner, and an emeritus minister of the

Seventh-day Adventist® church (SDA).[1] (Ex 9.) He is an expert in "stewardship education" and

has published books and led seminars on that topic. Pastor Hanson testified that, although he is

retired from employment with SDA, ministry continues to inform every aspect of his life,

including his business ventures. During 2014, he had three ventures: a longstanding custom-

---

[1] The registered-trademark symbol appears on Pastor Hanson's ministerial credentials. The court makes no assertion regarding SDA's trademark status.

parts-manufacturing business called Corex LLC, a real-estate holding company, and a stewardship-education project called Vital Truths Media LLC ("VTM"). The character of Pastor Hanson's activities related to VTM is the subject of this appeal.

The idea for VTM originated after Pastor Hanson received the writings of his late mentor, Pastor Mel Rees, from the executor of Pastor Rees's estate. Pastor Rees had developed a theology of stewardship that was formative in Pastor Hanson's ministry. One of Pastor Rees's endeavors had been the publication of a magazine conveying his principles of stewardship, subscriptions for which were sold to SDA congregations. Pastor Hanson's idea was to do with videos something like what Pastor Rees had done with printed magazines.

From 2011 to 2013, Pastor Hanson completed preliminary research, planning, and development for VTM. He and his wife attended services at many SDA congregations "with a stopwatch" in order to determine an appropriate video length. The plan he settled on was to produce weekly, 4-to-5-minute videos about stewardship that could be played during church services. (Ex 6.) Subscriptions would be offered to individual congregations for an annual fee of $60 to $120, depending on congregation size. (*Id*.) Multiplying an average subscription fee by the number of congregations in SDA's North American Division, Pastor Hanson estimated the project's initial gross income potential at over $450,000 annually.[2] (Ex 5 at 1.) He believed that income potential could be greatly expanded by translating the videos into Spanish, thus opening up markets in Central and South America. (*Id*.) Pastor Hanson obtained an Internet domain name for VTM and, in November 2013, he completed two prototype videos. By the end of 2013, VTM was "ready to launch." (*Id*.)

---

[2] Apart from missions, individual SDA congregations each belong to a geographical conference. (Ex 9A.) Each conference is headed by a president, and conferences within a wider region form a union conference, also headed by a president. The North American Division contains nine union conferences. (*Id*.)

Based on his knowledge of SDA's structure and internal dynamics, Pastor Hanson planned to market VTM's videos—called *Living Truth*—to SDA leadership before contacting pastors about subscriptions for their individual congregations. His initial target date to begin fulfilling subscriptions was January 2015; to meet that target, he aimed to produce six months' worth of weekly videos by October 2014.

In January 2014, Pastor Hanson met with the president of the North Pacific Union Conference (NPUC), who was pleased with his presentation and invited him to speak to the presidents of NPUC's constituent conferences at their upcoming meeting in March 2014. Pastor Hanson decided to wait for the results of that meeting before producing any more videos. In the meantime, he presented the *Living Truth* prototypes via telephone to the Director of Stewardship for the North American Division (NAD), which encompassed NPUC and the other eight union conferences. The NAD stewardship director was also pleased, "but wanted to think about the whole program," and suggested they set an in-person meeting in May.

On March 15, 2019, Pastor Hanson presented the *Living Truth* prototypes to the NPUC Presidents Council and was surprised to encounter "resistance." Pastor Hanson described that meeting as when "the wheels kind of came off" the project and he began to question its viability. However, he was invited by the president of the Idaho conference to present on stewardship to pastors and church members at upcoming events in November 2014, January 2015, and June 2015. Pastor Hanson agreed to waive his customary honorarium in exchange for an opportunity to present the *Living Truth* project at those events. He "put everything on hold"—including development of additional videos—and concentrated on preparing for those events, which he thought would give him a "feel for acceptance from pastors and members." (Ex 5 at 2.)

/ / /

In May 2014, Pastor Hanson flew to Salt Lake City to meet with the NAD stewardship director. Although the stewardship director expressed interest in what Pastor Hanson would learn at the upcoming Idaho meetings, he was unable to provide mailing lists or contact information for churches and pastors. Pastor Hanson described that meeting as another disappointment. (Ex 5 at 2.)

Pastor Hanson spoke at the conferences in Idaho in November 2014, January 2015, and June 2015, taking time to introduce *Living Truth* at each venue. (Ex 5 at 2.) His presentations were well-received by members, but not by pastors. (*Id*.) Noting that "pastors are the gatekeepers," Pastor Hanson began looking for a "plan B or C." (*Id*.)

In August 2015, Pastor Hanson met with a representative of "Faithlife Corporation / Logos Bible Software" regarding digitizing Pastor Rees's library of books and receiving a royalty when they were viewed. (Ex 5 at 3.) The representative informed Pastor Hanson that he would need to obtain a written copyright to proceed. In October 2015, Pastor Hanson was introduced to another publisher's representative, who advised him on how to obtain the copyright.

Shortly thereafter, Pastor Hanson began attempting to locate Pastor Rees's heirs and, on August 1, 2016, he purchased the copyright from them for $3,250. (Ex 5 at 3.) He then learned that "things had changed at Faithlife," and his bid to have the Rees works digitized by them was denied. (*Id*.) Over the next couple of years, Pastor Hanson made some unsuccessful attempts to digitize and edit the Rees library while dealing with health issues and family emergencies, with a plan to obtain $5,000 per year in licensing fees for up to five years upon completion. (*Id*. at 3–4.) In December 2018, he sold the copyright to NAD for $5,000 and, in January 2019, shipped

/ / /

the materials to Michigan, where NAD was to oversee their digitization.  At that point, Pastor

Hanson considered the VTM project over.  (*Id*.)

For each of the years 2011 through 2016, Plaintiffs filed a Schedule C identifying Pastor

Hanson's principal business or profession as "ministry."  (Exs C–H.)  On cross-examination,

Pastor Hanson stated he did not know why his accountant had described his profession as

ministry.  Pastor Hanson instead described his profession as "private businessman" and made

reference to Corex.

The following table summarizes Pastor Hanson's Schedule C revenue and expenses as

reported on the Schedule Cs in evidence.

| Year | Revenue | Expenses | Net Loss |
|------|---------|----------|----------|
| 2011 | $2,200 | $9,047 | ($6,847) |
| 2012 | -0- | $12,526 | ($12,526) |
| 2013 | $75 | $10,765 | ($10,690) |
| 2014 | -0- | $11,553 | ($11,553) |
| 2015 | -0- | $13,334 | ($13,334) |
| 2016 | -0- | $14,351 | ($14,351) |

Additionally, Defendant provided printouts summarizing Plaintiffs' prior years' returns back to

2004, all reporting business losses.  (Ex B.)

Pastor Hanson's accounting of his 2014 expenses was captioned "Ministry / Office

Expense Report – 2014."  (Ex I.)  That report described his two largest expenses—together over

half of the deducted loss—respectively as "Amazon.com" and "Logos Software."  (*Id*.)  The

Amazon expenses were primarily incurred in April, May, June, and December, and the Logos

expenses were primarily incurred in July, October, and December.  (*Id*.)  Other expenses of $400

or more were described as "The Great Courses," "Smart Sound," "Adobe," "Digital Juice Inc,"

and "Canon Vixia Refurb Camera."  (*Id*.)  Among the lesser expenses were what appear to be

several software applications and online purchases.  On cross-examination, Pastor Hanson

testified that he occasionally took work from Corex home, but that the "vast majority" of the expenses in 2014—"especially in 2014"—was for VTM. The total of the expenses on that report was $10,500.62; Pastor Hanson estimated all but $300 to $400 of them had been incurred for VTM. Some additional details from the expense report are included in the analysis below.

Plaintiffs' annual income from Corex LLC was separately reported on a Schedule E for years 2011 through 2014; the sources of additional Schedule E income reported in 2015 and 2016 were not viewable on the printouts submitted into evidence. (Exs C at 11, D at 9, E at 12, F at 9, G at 9, H at 9.) Plaintiffs also reported pension and social security income each year. (Exs C at 3, D at 3, E at 4, F at 3, G at 3, H at 3.) Plaintiffs do not dispute that their total income each year was sufficient to support them, even accounting for their Schedule C losses.

At audit, Defendant determined that Pastor Hanson's Schedule C activity had not been engaged in for profit and adjusted Plaintiffs' 2014 return accordingly. Defendant upheld that determination at conference. Plaintiffs now ask the court to reverse Defendant's adjustments.

## II. ANALYSIS

The issue for decision is whether the activity reported on Plaintiffs' Schedule C was "not engaged in for profit" within the meaning of Internal Revenue Code (IRC) section 183. The IRC is applicable because, subject to modifications not pertinent here, Oregon has adopted its definition of taxable income. *See* ORS 316.037(1); 316.022(6); 316.048.[3] Where practicable, the court interprets the IRC relying on "administrative and judicial interpretations of the federal income tax law." *See* ORS 316.032(2). Because Plaintiffs seek to have Defendant's determination overturned, they must bear the burden of proof. *See* ORS 305.427.

/ / /

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

To claim the deduction for business expenses provided in IRC section 162, a taxpayer must engage in an activity with a primary purpose of obtaining income or profit. *Morey v. Dept. of Rev.*, 18 OTR 76, 87–88 (2004) (citing *Commi'r v. Groetzinger*, 480 US 23, 27, 107 S Ct 980, 94 L Ed 2d 25 (1987)). Where a taxpayer's primary purpose is not to make a profit, the same deductions may be taken as would be allowed for profit-seeking ventures, but they are limited to the amount of revenue generated by the activity in question. IRC § 183(b)(2). Thus, individual taxpayers cannot receive a net tax benefit for expenses related to their nonprofit activities.

A.    *Nature of Plaintiffs' Schedule C Activity*

A threshold question in the present case involves identifying the activity for which Plaintiffs' reported expenses were incurred. At the initial case management conference, the court understood the activity in question to be the production and distribution of *Living Truth* videos for VTM. At trial, it became clear that VTM's efforts eventually shifted from video production to digitizing the works of Pastor Rees. Furthermore, Pastor Hanson admitted that some of the expenses claimed on Plaintiffs' Schedule C were not for VTM at all. It appears, then, that Plaintiffs' Schedule Cs reported more than Pastor Hanson's VTM activity, and that Pastor Hanson's VTM activity included both the *Living Truth* project and the digitization project.

Plaintiffs reported the principal business of Pastor Hanson as "ministry" on their Schedule Cs from 2011 to 2016. Ministry is a category that could include multiple apostolic efforts. That Pastor Hanson's ministry included activity beyond VTM in 2011 and 2013 is shown by the fact that Plaintiffs reported revenue in each of those years. That revenue did not arise from VTM, as the *Living Truth* project was still in its development phase and had not generated a single sale. The only other ministry-related activities mentioned at trial were Pastor Hanson's writing and his public speaking, for which he customarily received *honoraria*.

Pastor Hanson's 2014 expense report was captioned "Ministry / Office Expense Report." The largest portion of the identifiable expenses was for professional development material such as Bible software, "The Great Courses," and a subscription to Biblical Archaeology Review. Another significant portion was for general office software—Adobe, Microsoft, and Corel. Expenses for music- and video-production-related software were also significant, but were largely incurred after Pastor Hanson put development of *Living Truth* "on hold" following the NPUC Presidents Council. In fact, only 12 percent of the year's total expenses were incurred by the end of March.

Pastor Hanson testified that his accountant had erred in labeling his Schedule C profession as "ministry." However, although Pastor Hanson was generally a highly credible witness, his testimony on that point conflated his work for Corex—which was reflected on Plaintiffs' Schedule E—with the work reflected on Plaintiffs' Schedule C. It is not enough to overcome the weight of the written evidence. It is more likely than not that Plaintiffs' Schedule C activity was general ministry and included Pastor Hanson's work writing and giving seminars as well as VTM.

B.      *Intent of Plaintiffs' Schedule C Activity*

From a tax perspective, there is no reason why the profession of ministry could not be conducted for profit, as the professions of law and medicine typically are. The question is whether that was Pastor Hanson's intention. *See* IRC § 183. As noted in the regulations, "a reasonable expectation of profit is not required[.]" Treas Reg § 1.183–2(a). However, due to the possibility of self-deception, "objective facts" are generally weightier than statements of intent. *Cf. id.*

/ / /

Treasury Regulations section 1.183–2(b) provides a nonexclusive list of nine factors, based on case law, for consideration in determining whether a given activity is engaged in for profit:

> "(1) The manner in which taxpayers carried out the activity;
> "(2) The expertise of taxpayers or their advisors;
> "(3) The time and effort expended by the taxpayers in carrying on the activity;
> "(4) Expectation that assets used may appreciate in value;
> "(5) The success of the taxpayers in carrying on similar or dissimilar activities
> "(6) The taxpayers' history of income or losses with respect to the activity;
> "(7) The amount of occasional profits, if any, which are earned;
> "(8) The financial status of the taxpayer; and
> "(9) Elements of personal pleasure or recreation."

*Hillenga v. Dept. of Rev.*, 21 OTR 396, 404-405 (2014), *aff'd in part, rev'd in part*, 358 Or 178, 361 P3d 598 (2015). While those factors "broadly take in the salient features of an activity deliberately and conscientiously pursued for profit, as opposed to one pursued for other purposes[,]" they are not to be applied formulaically. *Id at 405*. In this case, the court finds factors 1, 6, 7, 8, and 9 most revealing.

With regard to factors 6 to 8, Plaintiffs' long history of Schedule C losses coupled with income from other sources suggest they did not need to make a profit from Pastor Hanson's ministry. Plaintiffs reported a loss on every Schedule C in evidence, back to 2011, and Defendant provided a summary showing that Plaintiffs claimed Schedule C losses for every previous year back to 2004. Not only did Plaintiffs lose money, but their Schedule Cs showed no pattern of revenue growth. The only two years in which Plaintiffs reported any revenue at all were 2011 and 2013. In 2011, their reported revenue was less than a quarter of their reported expenses; in 2013, it was less than one percent. During all this period, Plaintiffs had income from other sources that they offset with their Schedule C losses.

/ / /

Considering factor 1, the court asks whether the activity was conducted "in a businesslike manner." Treas Reg § 1.183–2(b)(1). "Perhaps the most important indication of whether an activity is being performed in a businesslike manner is whether the taxpayer implements methods for controlling losses, including efforts to reduce expenses and generate income." *Foster v. Comm'r*, 104 TCM (CCH) 90 (2012); *see also Dodge v. Comm'r*, 75 TCM (CCH) 1914 (1998), *aff'd*, 188 F3d 507 (6th Cir 1999).

Here, there was no correlation between Pastor Hanson's expenses and either the actual or the potential revenue of his ministry. Although he initially saw potential for significant revenue from *Living Truth*, he considered that it would be necessary to win the support of SDA leadership. Encountering "resistance" at the Presidents Council in March 2014, he put *Living Truth* on hold. By May at the latest—when he tried and failed to obtain a nationwide mailing list in order to market *Living Truth* directly to pastors—it was clear that his initial revenue projection was not realistic, based as it was on selling subscriptions to every SDA church in North America. Yet his expenses did not decrease. In 2014, 88 percent of the expenses were incurred after March, and 56 percent were incurred after May. In 2015—when he shifted from *Living Truth* to the much-less-lucrative digitization project—his ministry expenses actually increased from the previous year. In 2016, they increased again. Pastor Hanson's plan was to receive at most $25,000 in licensing fees from digitizing Pastor Rees's works—$5,000 per year for five years— yet he incurred over $27,000 in expenses in 2015 and 2016 alone, and continued pursuing the digitization project through 2018.

With respect to factor 9, the circumstances strongly suggest personal motives. The subject of both *Living Truth* and the digitization project was the works of Pastor Rees. Pastor Hanson's high regard for Pastor Rees and his theology of stewardship was evident at trial when

he spoke of the "importance" of Pastor Rees's works. By publicizing and distributing those works, Pastor Hanson would be both honoring his late mentor and forwarding their shared mission. Pastor Hanson's desire to promote Pastor Rees's works in particular is most evident from his decision to pursue the digitization project after abandoning the *Living Truth* project. When he began the digitization project, he did not own the copyright to the Rees works; he had no prior financial investment and was essentially beginning anew. Given his ongoing expenses of over $10,000 per year, his estimated revenue of $5,000 per year from digitization is not enough to explain why he did it.

Considering the evidence as a whole, profit-seeking does not explain Pastor Hanson's 2014 ministry expenses. While he hoped for profit in the beginning, his expenditures did not diminish when the potential for profit faded. Given Pastor Hanson's connection to Pastor Rees, his activity is more probably explained by a desire to honor and share the legacy of a mentor.

### III.  CONCLUSION

The court concludes Pastor Hanson lacked the profit-seeking intent required for Plaintiffs to deduct his ministry expenses under IRC section 162. Because Plaintiffs reported no Schedule C revenue in 2014, no deduction is allowable under IRC section 183. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of September, 2019.

_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*
*Your complaint must be submitted within 60 days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*
*This document was signed by Magistrate Poul F. Lundgren and entered on September 26, 2019.*