IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| JOHN A. CARSON and MARLIS C. CARSON, | ) ) ) | |
| Plaintiffs, | ) | TC-MD 150355N (Control) |
| | ) | |
| v. | ) ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) ) | |
| Defendant. | ) ) | |
| | ) ) | |
| JOHN A. CARSON and MARLIS C. CARSON, | ) ) ) | |
| Plaintiffs, | ) | TC-MD 160203N |
| | ) | |
| v. | ) ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) ) | |
| Defendant. | ) | **FINAL DECISION** |

The court entered its Decision in the above-entitled matter on October 10, 2016.

Plaintiffs timely filed a Statement for Costs and Disbursements (Statement) on October 21, 2016,

requesting their costs in the amount of $504 for the court filing fees. Defendant timely filed an

Objection to Plaintiffs' Statement on October 31, 2016. The court's analysis and determination

of Plaintiffs' request for costs and disbursements is contained in section III. The court's Final

Decision otherwise incorporates its Decision without change.

Plaintiffs appeal Defendant's Notice of Deficiency Assessment, dated April 7, 2015, and

Notice of Assessment dated January 26, 2016, for the 2010 and 2011 tax years, respectively. A

trial was held on June 8, 2016, in the courtroom of the Oregon Tax Court in Salem, Oregon. Ted

E. Runstein, attorney, appeared on behalf of Plaintiffs. John A. Carson (John) and Marlis C. Carson (Marlis) testified on behalf of Plaintiffs.[1] Nancy Berwick, tax auditor, appeared on behalf of Defendant. The parties filed Stipulated Facts on June 7, 2016. Plaintiffs' Exhibit 1 and Defendant's Exhibits A through S were received without objection.

## I. STATEMENT OF FACTS

Plaintiffs owned two residences during the tax years at issue; one in Lake Oswego, Oregon and the other in Sun Valley, Idaho. (Stip Facts at ¶¶11-12.) There is no dispute that Plaintiffs were domiciled in Oregon prior to 2009. (*Id.* at ¶5.) Marlis testified that, in 2008, John turned 80 and she had survived cancer; at that point in time they decided to make the move from Oregon to Idaho. She testified that they planned to make the transition from Oregon to Idaho in 2009 because 2008 was already half over. Marlis testified that Plaintiffs talked with their accountant in 2008 about their decision to move to Idaho and they were told that they needed to be out of Oregon for at least six months plus one day.[2] John and Marlis each testified that, during the tax years at issue, they typically spent summers and winters in Idaho, and springs and falls in Oregon or elsewhere. They each testified that, during the 2009, 2010, and 2011 years, John kept track of days that Plaintiffs spent in Idaho. (Ptfs' Ex 1 at 1-3.) Their total annual days in Idaho were as follows: 226 in 2009; 186 in 2010; and 185 days in 2011. (*Id.*) No evidence was presented to indicate how many days Plaintiffs spent in Oregon each year.[3]

/ / /

---

[1] When referring to a party in a written decision, it is customary for the court to use the last name. In this case, the court's Decision references two individuals with the same last name, Carson. To avoid confusion, the court will use the first name of the individual being referenced.

[2] Defendant questioned whether Plaintiffs' residency change was a tax planning tool. Marlis testified in response that income taxes were not a part of the decision. She testified that Sun Valley, Idaho imposes a nine percent sales tax, so the change to Idaho did not result in a big tax advantage.

[3] Plaintiffs' residency questionnaire submitted to Defendant states that Plaintiffs spent "170 or less" days in Oregon in 2009, 2010, and 2011. (Def's Ex F at 2.)

For the 2010 and 2011 tax years, Plaintiffs timely filed joint Oregon income tax returns as full-year nonresidents of Oregon. (Stip Facts at ¶1.) Defendant issued notices of assessment based on its determination that Plaintiffs did not intend to abandon their Oregon domicile as of 2010 or 2011. (*See* Def's Ex D, Conference Decision Ltr at 5.) Plaintiffs assert that they were domiciled in Idaho, not Oregon, in 2010 and 2011. (Compl at 1.)

A.      *Plaintiffs' Oregon Connections*

1.      *Early life and family*

John and Marlis were each born in Oregon and were domiciled in Oregon all of their lives until at least 2008. (*See* Stip Facts at ¶¶4-5.) John testified that he served in the Navy after high school and then attended the University of Oregon. He testified that, after attending university, he joined the Infantry and served during the Korean War. John testified that, after completing his military service, he returned to Oregon to work. John bought a house in Lake Oswego in 1969. (*Id*. at ¶12.) John testified that he and Marlis married in 1970. He testified that, after Plaintiffs' marriage, they added a bedroom to the Lake Oswego house for their children. During the tax years at issue, Plaintiffs maintained "minimal personal effects" in their Lake Oswego house for use when they visited Oregon. (*Id.* at ¶12.) John testified that Plaintiffs have never wanted to sell their Lake Oswego house and may leave it to their children. (*See id.*)

Plaintiffs have four adult children who each lived in Oregon at least part of the year. (Stip Facts at ¶20.) Marlis testified that one of Plaintiffs' daughters lived in California in 2010 and 2011, and she temporarily lived in Plaintiffs' Lake Oswego house upon her return to Oregon in 2011. She testified that, as of the date of trial, one of Plaintiffs' sons lived in Palm Springs, California, and Plaintiffs periodically visited him there.

/ / /

2. *Business activities*

John testified that he purchased an oil company in 1971 that became Carson Oil. (*See also* Stip Facts at ¶9.[4]) John testified that he retired in 2004 and sold Carson Oil to his stepson on a 10-year payment schedule. (*See also id.*) He testified that his stepson now runs the company. Since 2004, John has received a $500 monthly stipend from Carson Oil that is intended to pay for a portion of his medical expenses. (*Id.* at ¶10; *see also* Def's Ex R.) John testified that there are gaps in his Medicare coverage for vision and dental, so the stipend is to supplement Medicare. He testified that the stipend was not paid in return for services rendered to Carson Oil during the tax years at issue, even though he may on occasion have spoken with his stepson about the business during that time.

John testified that, as of 2004, he owned three commercial properties in Oregon. He testified that he eventually sold all three properties to his stepson. According to their 2010 and 2011 Schedules E, Plaintiffs received rental income of $37,200 and $24,800, respectively, from a commercial property located in Cascade Locks, Oregon. (Def's Exs K at 16, L at 13.) John and Marlis were each surprised to learn that they still owned the Cascade Locks property in 2010 and 2011. According to an OLCC News Release, dated November 21, 2011, Plaintiffs were listed as corporate principals for the Food Mart in Hood River, Oregon. (Def's Ex Q at 1.) John testified that he was not a corporate principal of Food Mart in 2011.

3. *Community and philanthropic activities*

Historically, Plaintiffs were active with Oregon organizations. By 2008, Plaintiffs had "discontinued long-term financial support to the Oregon Symphony" and "discontinued long-term personal involvement * * * with Legacy/Good Samaritan Medical Center and the Oregon

---

[4] The Stipulated Facts state that Carson Oil Co., Inc. was established in 1957, but John testified that he purchased it in 1971.

Environmental Council." (Stip Facts at ¶¶29-30.) John did not serve as a board member for any Oregon organizations during the tax years at issue. (*Id.* at ¶17.)

Plaintiffs continued some philanthropic activities in Oregon during the tax years at issue. "The John & Marlis Fund was associated with the Oregon Community Foundation during the [tax] years at issue." (Stip Facts at ¶19.) Marlis testified that Plaintiffs were required to be actively involved with the Oregon Community Foundation to direct the use of their donated funds. Plaintiffs donated less than $100 to the Hoyt Arboretum between April 2015 and March 2016. (Def's Ex P at 3-4.) Marlis was on the "advisory board" of the Dougy Center, a Portland-based nonprofit. (*Id.* at 5.) She testified that everyone who donates is listed on the advisory board.

John testified that he and Marlis have been involved with the Salvation Army since about 1961. He testified that Oregon and Idaho are in the same Salvation Army region. John testified that the regional director offered to name a building in Portland after Plaintiffs in recognition of their generosity and they accepted. (*See* Def's Ex P at 6.) He testified that the building is a safe house for women and children.

Plaintiffs were members of the Multnomah Athletic Club in Portland for 63 years. (Stip Facts at ¶6.) John testified that Plaintiffs were still members in 2010 and 2011; they terminated membership in 2015. They "became inactive in the club because of [their] time spent in Idaho." (*Id.*) Plaintiffs attended church in Oregon occasionally. (*Id.* at ¶8.) John was a member of the Oregon American Legion during the tax years at issue. (*Id.* at ¶7.)

4.     *Other Oregon connections*

John relinquished his Oregon driver's license in February 2009. (Def's Ex H at 1.) Marlis relinquished her Oregon driver's license in March 2011. (*Id.* at 2.) Marlis testified that

she waited until her Oregon driver's license expired before getting an Idaho driver's license. Plaintiffs have two cars registered and maintained in Oregon.[5] (Stip Facts at ¶16.) John testified that Plaintiffs typically fly between Oregon and Idaho, so having cars in Oregon is convenient. Neither John nor Marlis were registered to vote in Oregon during the years at issue. (*Id.* at ¶14.) "Professionals handling [Plaintiffs'] financial matters are in Oregon."[6] (*Id.* at ¶32.) Plaintiffs' grantor trusts were administered in Oregon. (*Id.* at ¶21.)

B.     *Plaintiffs' Idaho Connections*

John testified that he had a tough childhood, but saw the movie *Sun Valley Serenade* – a ski movie set in Sun Valley – in high school, which inspired his lifelong dream to live the Sun Valley lifestyle. He testified that he joined the University of Oregon ski team during college and traveled to Sun Valley to ski during that time. Marlis testified that John took her to see *Sun Valley Serenade* on their second date and he told her about seeing the movie during his youth and his dream to live there one day. John testified that he always intended make Sun Valley Plaintiffs' permanent residence someday.

In 1984, Plaintiffs purchased a condominium unit in Sun Valley. (Stip Facts at ¶11.) In 1997, Plaintiffs sold that condominium and purchased a three-bedroom house in Sun Valley. (*Id.*) John testified that Plaintiffs purchased the house because it had no stairs and it was larger with more bedrooms for visiting family. He testified it was Plaintiffs' intent at that time to eventually reside permanently in the Sun Valley house. Plaintiffs had and have a PO Box for a mailing address in Idaho because the post office will not deliver mail in the area. (*Id.*)

/ / /

---

[5] The stipulated facts indicated only one car in Oregon, but John testified that they had two cars.

[6] John testified that he did not know of any financial advisors.

Marlis testified that, although Plaintiffs' children lived in Oregon, Plaintiffs saw their family more frequently in Idaho than in Oregon. Plaintiffs' family tended to visit them for fishing, golf, and a Jazz Festival during summer, and for skiing in the winter. (Stip Facts at ¶22.)

1. *Community and philanthropic activities*

John and Marlis each testified that the majority of their friends are in Idaho. Marlis testified that Plaintiffs are very active in Idaho: they hike with a group and ski every day they can. Plaintiffs became members of the Sun Valley and Sawtooth Ski Clubs prior to 2000. (Stip Facts at ¶10.) John was a member of the Idaho American Legion during the years at issue. (*Id.* at ¶7.) Marlis testified that Plaintiffs were and are very involved with the Idaho Symphony. Plaintiffs have been members of "a church in Ketchum, Idaho, since 2002." (*Id.* at ¶8.)

Plaintiffs contributed to several Idaho charities and organizations. Plaintiffs "supported the Sun Valley Symphony since before 2000"; "the Galena Lodge Project, a donation based recreational area in Idaho"; the Idaho Conservation League; the Sun Valley Center for the Arts since 2004; the Community Library in Idaho since before 2000; and the St. Luke's Hospital in Sun Valley. (Stip Facts at ¶¶23-28.)

2. *Other Idaho connections*

Plaintiffs have each been registered to vote in Idaho since December 2008. (Stip Facts at ¶14.) Marlis testified that she obtained an Idaho driver's license when her Oregon license expired in 2011. Plaintiffs had two vehicles registered in Idaho. (*Id.* at ¶15.) John and Marlis each testified that their checking account is in Idaho. Marlis testified that her doctor is in Idaho. (*See also id.* at ¶33.) Beginning with tax year 2009, Plaintiffs filed Idaho resident income tax returns. (*Id.* at ¶2.) Marlis testified that Idaho considers Plaintiffs to be residents and they received a resident property tax benefit, which was a "nice surprise."

## II. ANALYSIS

The issue in this case is whether Plaintiffs were domiciled in Oregon or Idaho during the 2010 and 2011 tax years. "Oregon imposes a tax on the entire taxable income of Oregon residents—even income earned from sources outside of this state, unless explicitly exempted." *Hillenga v. Dept. of Rev.*, 21 OTR 396, 400 (2014), *aff'd in part, rev'd in part*, 358 Or 178, 361 P3d 598 (2015). Oregon imposes a state income tax on every nonresident with Oregon source income "that is derived from sources within this state." ORS 316.037(3).[7]

A " 'resident' or 'resident of this state' means: [a]n individual who is domiciled in this state * * *." ORS 316.027(1)(a)(A). "A domicile differs from a residence in that a person may have many residences, but they can only have one domicile. A person's domicile remains that person's domicile until that person establishes a new domicile at a different location." *Hillenga*, 21 OTR at 401 (citations omitted). In order to effect a change in domicile three requirements must be satisfied: "(1) residence in another place, (2) an intention to abandon the old domicil, and (3) an intention to acquire a new domicil." *Elwert v. Elwert*, 196 Or 256, 265, 248 P2d 874 (1952); *see also Davis v. Dept. of Rev.,* 13 OTR 260, 264 (1995). As the party seeking relief, Plaintiffs bear the burden of proof by a preponderance of the evidence. ORS 305.427.

There is no dispute that Plaintiffs were domiciled in Oregon prior to 2009. They assert that they changed their domicile to Idaho in 2009. The first requirement for a change in domicile is a residence in another place. "Residence" and "place of abode" are synonymous and each "signifies a building or shelter which is the dwelling place of a person." *Ramsey v. Dept. of Rev.*, 7 OTR 478, 481 (1978). Plaintiffs acquired a residence in Idaho in 1984, thereby satisfying the first requirement for a change in domicile.

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

"The intent to abandon an old domicile and to acquire a new one must be a present intent." *Dane v. Dept. of Rev.*, 21 OTR 15, 22 (2012), citing *Oberhettinger v. Dept. of Rev.*, 4 OTR 62, 64 (1970). "Factors that contribute to determining domicile include family, business activities and social connections." OAR 150-316.027(1)(a). "Because the criteria governing domicile are unavoidably subjective, the court cannot simply rely on the potentially self-serving testimony of the person or persons concerned; the question must be answered by reference to the objective circumstances and the overt acts of the person or persons at issue." *Hillenga*, 21 OTR at 401, citing *Hudspeth v. Dept. of Rev.*, 4 OTR 296, 298 (1971).

It is evident from the facts presented that Plaintiffs maintained significant ties to both Oregon and Idaho during the tax years at issue. Plaintiffs had sufficient means to maintain houses, cars, and personal possessions in both Oregon and Idaho. Similarly, Plaintiffs participated in some social and philanthropic activities in both states. Plaintiffs' adult children each lived in Oregon at least part-time during the tax years at issue. However, Plaintiffs testified that they spent more time with their children in Idaho during family vacations. Those facts each demonstrate ties to both states and are not especially helpful in determining Plaintiffs' domicile.

Another challenge in determining Plaintiffs' intent from objective facts is identifying a notable occurrence in 2008 or 2009 that would support a finding that Plaintiffs changed their domicile from Oregon to Idaho.[8] Plaintiffs have owned residential property in Idaho since 1984 and they purchased their current house in 1997. John retired and sold his primary business, Carson Oil, in 2004, yet continued to consider himself an Oregon resident after 2004. *See, e.g., Dane*, 21 OTR at 23 (concluding that the taxpayer's retirement alone was not evidence of his intent to abandon his Oregon domicile when, five years after his retirement, he continued to

---

[8] Often people move due to a change in their employment or marital status. No such facts are present here.

spend roughly 40 percent of his time in Oregon). When asked during trial about the significance of 2008, Marlis testified that John turned 80 in 2008 and she had survived cancer. Those events were the impetus for Plaintiffs to make the move to Idaho. Given that Plaintiffs already owned a house in Idaho and they maintained their house in Oregon, the practical effect of their move was to make Idaho their primary residence and Oregon their secondary residence.

The question is whether Plaintiffs had taken sufficient steps as of the tax years at issue to abandon their Oregon domicile and acquire an Idaho domicile. As noted above, Plaintiffs were retired as of the tax years at issue and had few business connections to either state. By 2010, John had sold all but one of his commercial properties in Oregon. No evidence was presented to indicate that John spent time in Oregon managing that property. *See, e.g., Dane*, 21 OTR at 25 ("Taxpayer's real property holdings in Oregon – and more specifically, the manner of [his] involvement with taxpayer's real estate holdings in Oregon – are the deciding factor in this case."). Similarly, Plaintiffs' family connections to each state are inconclusive. Plaintiffs' children are adults who live on their own. Plaintiffs spend time with their children in both states.

Philanthropy and community involvement have long been important aspects of Plaintiffs' lives. In years prior to 2008, Plaintiffs were involved with several Oregon organizations both through financial contributions and as board members. As of 2008, Plaintiffs had ceased some of those activities in Oregon and redirected their efforts toward several Idaho organizations. Plaintiffs maintained some involvement with Oregon organizations: they were involved with the management of a charitable fund in Oregon and donated to a few Oregon organizations. With respect to their social connections, Plaintiffs spent time engaged in outdoor recreation with hiking and skiing clubs in Idaho. However, they also maintained their membership in the Multnomah Athletic Club until 2015.

After Plaintiffs decided to change their primary residence from Oregon to Idaho, they relinquished their Oregon driver's licenses in favor of Idaho licenses, registered to vote in Idaho, filed Idaho resident income tax returns, and received an Idaho resident "property tax break." (Stip Facts at ¶31.) Following a conversation with their accountant in 2008, Plaintiffs tracked their days in Idaho to ensure that they, in fact, spent more time in Idaho than in Oregon. This court has, at times, not placed significant weight on those facts, particularly where other facts clearly overshadow their significance. *See, e.g., Hudspeth v. Dept. of Rev.*, 4 OTR 296, 299 (1971) (finding taxpayer abandoned his Oregon domicile even though he retained his Oregon voter registration because taxpayer was working full time at a lumber mill in Colorado); *Brueske v. Dept. of Rev.*, TC-MD 090020D, WL 724425 at *5 (Mar 3, 2010) (finding the taxpayer had abandoned his Oregon domicile even though he retained his Oregon driver's license and voter registration because he lived and worked in Arizona); *Smith v. Dept. of Rev.*, TC-MD 150312N, WL 2984472 at *7 (May 17, 2016) (finding little probative value in the fact that the taxpayer retained an Oregon driver's license where taxpayer worked Washington). However, those "facts each, at the margins" demonstrate Plaintiffs' intent. *Ashby v. Dept. of Rev.*, 21 OTR 47, 52 (2012). When the court has placed little weight on those facts, it was because they appeared insignificant in the wider context of the taxpayer's life. In this case, Plaintiffs acted purposefully to change their licenses and registrations and, under the circumstances, those changes were significant. The court is persuaded that those actions demonstrated Plaintiffs' sincere intent to change their domicile to Idaho.

This case presents a close call with respect to Plaintiffs' domicile given their connections to both Oregon and Idaho. Plaintiffs' testimony regarding their dream to live in Sun Valley was compelling. Ultimately, the court is persuaded that, as of the tax years at issue, Plaintiffs had

effected a change in their domicile from Oregon to Idaho as part of their long-term plan to retire in Idaho. Plaintiffs spent the majority of each year in Idaho and took overt actions consistent with their stated intent, by changing their driver's licenses and voter registration.

### III. COSTS AND DISBURSEMENTS FACTS AND ANALYSIS

Plaintiffs filed a Statement requesting an award of $504 for their filing fees. Defendant filed an objection to Plaintiffs' Statement on October 31, 2016. The Magistrate Division has discretionary authority under ORS 305.490(2) to award costs and disbursements to the prevailing party. *Wihtol I. v. Dept. of Rev.*, 21 OTR 260, 267–68 (2013); TCR-MD[9] 16. Although TCR-MD 16 does not define "prevailing party," this court has looked to the definition of "prevailing party" found in ORS 20.077(2), regarding making an award of attorney fees, for guidance. *Stade v. Dept. of Rev.*, TC-MD 150369N, WL 282206 at *5 (Jan 21, 2016). ORS 20.077(2) defines the prevailing party as "the party who receives a favorable judgment or arbitration award on the claim." Thus, the court must determine the prevailing party on a "claim-by-claim basis," weighing "what was sought by each party against the result obtained." *Stade*, 2016 WL 282206 at *5 (citations and internal quotation marks omitted).

In this case, Plaintiffs challenged Defendant's Notices of Assessment based on its determination that Plaintiffs were domiciled in Oregon. The court concluded that Plaintiffs were domiciled in Idaho, rather than Oregon. Plaintiffs are, therefore, the prevailing party.

The next question is whether the court should exercise its discretion to award costs and disbursements to Plaintiffs. This court has previously identified several considerations relevant to its decision to award costs, including whether the originally filed return was accurate, whether the taxpayer availed himself of any administrative appeal available to him, and "whether the

---

[9] Tax Court Rule-Magistrate Division

outcome on appeal involved wins and losses for both parties." *Stade*, 2016 WL 282206 at *5; *see also Wihtol v. Multnomah County Assessor,* TC-MD 120762N, WL 274126 at *5 (Jan 24, 2014).

Defendant gave a few reasons in support of its opposition to Plaintiffs' request for costs. First, Defendant asserted that it had an "expectation of prevailing in court" because the "conference officer was very thorough in his review of the documentation and in allowing additional time for the Plaintiff's representatives to provide additional evidence and then writing a long and carefully considered conference decision in favor of the Defendant." (Def's Objection at 1.) Second, Defendant argued that Plaintiffs caused Defendant confusion regarding the status of trial in the Magistrate Division and, as a result, Defendant was not adequately prepared for trial. (*Id.*) Specifically, Plaintiffs filed a petition for special designation less than 30 days before the scheduled June 8, 2016, trial date, causing the case to be held pending the outcome of that petition. (*Id.*) Third, Defendant noted that the court relied in part on calendars that had not been provided during the audit or conference and "only came to light during the trial." (*Id.* at 12.)

The court is skeptical that Defendant would have reached a different determination had it been provided Plaintiffs' calendar during the audit or conference. However, the court recognizes that Defendant did not receive that piece of evidence prior to this appeal, and as a result, a different outcome might have been possible. As stated above, this case presented a close call. Domicile determinations are fact-specific, and reasonable minds can reach different conclusions viewing the same or similar sets of facts. Defendant made a reasoned determination based on the evidence it had received. For those reasons, the court finds a cost award is not appropriate in this case.

IV. CONCLUSION

After careful consideration, the court finds that Plaintiffs have demonstrated by a preponderance of the evidence that they were domiciled in Idaho rather than Oregon during the 2010 and 2011 tax years. The court further finds Plaintiffs' request for costs and disbursements should be denied. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted.

IT IS FURTHER DECIDED that Plaintiffs' request for costs and disbursements is denied.

Dated this ____ day of November 2016.

 

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on November 18, 2016.*