IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

TIMOTHY GARRISON,                    )
                                     )
          Plaintiff,                 )     TC-MD 150487N
                                     )
     v.                              )
                                     )
DEPARTMENT OF REVENUE,               )
State of Oregon,                     )
                                     )
          Defendant.                 )     **FINAL DECISION**[1]

Plaintiff appeals Defendant's Notices of Deficiency Assessment for the 2009 and 2010

tax years.  Prior to trial on May 11, 2016, the parties resolved all issues pertaining to the 2009 tax

year and several of the issues pertaining to the 2010 tax year.  The parties filed a signed

Stipulation on June 17, 2016, reflecting their agreement reached prior to trial.  The parties'

Stipulation is attached and hereby incorporated in this Decision.

A trial on the remaining 2010 tax year issues was held on May 11, 2016, in the courtroom

of the Oregon Tax Court in Salem, Oregon.  J. Kevin Shuba, Attorney-at-Law, appeared on

behalf of Plaintiff.  Plaintiff and Kristi Minto (Minto), CPA, testified on behalf of Plaintiff.

Plaintiff called Silvia Comacho-Scyoc (Comacho-Scyoc), Tax Auditor, to testify as a witness.

James Strong, Assistant Attorney General, appeared on behalf of Defendant.  Defendant did not

call any witnesses.  Plaintiff's Exhibits 8, 9, 10, 14, 19, and page 9 of Exhibit 21 were received

without objection.  Plaintiff offered as an exhibit a packet of cancelled checks, some of which

Plaintiff testified were substantiation for items on his 2010 depreciation schedule.  Defendant

objected to the admission of that exhibit because it was not timely exchanged under Tax Court

---

[1] This Final Decision incorporates without change the court's Decision, entered December 6, 2016.  The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered.  *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

Rule-Magistrate Division (TCR-MD) 12. Plaintiff argued that the exhibit should nevertheless be admitted either to achieve substantial justice or because it was a rebuttal exhibit. The court excluded the exhibit because it should have been exchanged prior to trial along with Plaintiff's other exhibits and no exception applied that would justify the untimely submission of the exhibit.

Plaintiff's Written Closing Argument was filed June 17, 2016. Defendant's Post-Trial Brief was filed July 1, 2016. Plaintiff's Post-Trial Reply was filed July 8, 2016. This matter is now ready for the court's determination.

## I. STATEMENT OF FACTS

This case concerns certain of Plaintiff's 2010 business expenses: specifically, deductions for cost of goods sold (COGS) and depreciation. (*See* Ptf's Written Closing at 1–2.) Plaintiff also challenges the substantial understatement of income (SUI) penalty imposed. (*Id.* at 9.)

A.    *Plaintiff's Businesses*

Plaintiff filed two 2010 Schedules C: one for Garrison Investment Group LLC, which described its principal business as "pallet repairs and"; and the other for a business described as "pallets." (Ptf's Ex 10 at 10, 12.)

1.    *ATM business*

Plaintiff testified that one of his business activities involved owning and operating ATMs throughout the state of Oregon, including all of the ATMs in the DMV license renewal offices. He testified that his business involved stocking the ATMs with cash. Plaintiff testified that he had to drive to the bank to get cash out of his bank account, then drive to the ATM locations and put cash into the ATMs. Plaintiff testified that when a customer withdraws cash from one of his ATMs, the customer's bank automatically transfers money to Plaintiff's bank account.

/ / /

2.      *Pallet business*

Plaintiff testified that he opened a pallet company called Garrison Pallet Co., in January 2010. He testified that he previously co-owned Oregon Pallet Co. for approximately 10 years; the other two-thirds owners were his family, and they voted him out of the company, after which he decided to open a new pallet company. Plaintiff testified that his business involved getting used pallets from businesses such as grocery stores and distribution centers, repairing or salvaging the pallets, and then reselling the pallets. He testified that he parked a big "box van" (which he also described as a "semi-truck trailer") at a store or distribution center, and they filled it up with used pallets and called Plaintiff when the trailer was full.

Plaintiff testified that he used two sizes of trucks in his business: a classic semi-truck and trailer combination and a truck with a 12 or 14-foot flatbed. He testified that he also needed vehicles that could haul 100 pallets or so to show as samples. Plaintiff testified that he had an account with Lowe's in 2010 that required four or five trailers for its distribution center and one trailer at 14 other locations, for a total of approximately 19 trailers. He testified that a box van trailer cost around $5,000 per trailer in 2010. Plaintiff testified that he needed approximately 25 flatbed trailers in 2010 to make pallet deliveries; he purchased some and leased the rest. Plaintiff testified that he thought he purchased seven or eight flatbed trailers from Ritchie Brothers Auctions for approximately $70,000 in 2010. Plaintiff testified that, in 2010, he purchased 12 tractor trucks from WinCo; he did "not recall exactly," but thought he paid approximately $120,000.[2] He testified that, in order to make that purchase as a group, he had to form a dealership, West Coast Trucks. Plaintiff could not recall if he registered the trucks in his business name. He testified that he "ran six or seven of those trucks in the pallet company."

_____

[2] Plaintiff's written closing argument stated that he purchased 20 tractors from WinCo for $63,000. (Ptf's Written Closing at 5.)

Plaintiff testified that, in order to operate his pallet business, he needed machines and equipment including ramps, forklifts, band saws, jigs, nail guns, and compressors. He testified that he also needed tracking devices for his trucks and various office supplies. Plaintiff testified that, in 2010, he also had to buy a lot of lumber to make new pallets.

3.    *Garrison Investment Group*

Plaintiff testified that, through Garrison Investment Group, he tried to help new start-up companies. He testified that, in 2010, he purchased a residential property located in Bend, Oregon (the Bend house), through the Investment Group. Plaintiff testified that he had two reasons for purchasing the Bend house. First, his bank did not have a branch in Bend in 2010, so he used the Bend property as a cash depot for his ATM business. Plaintiff testified that he installed a safe with security cameras in the garage of the Bend house and stored cash in that safe to supply ATMs in the Bend area. Plaintiff testified that a person in Bend deposited cash in ATMs for him, but he did not want to leave cash at her house. Second, in the long-term, Plaintiff planned to put the Bend house into the vacation rental pool.

Plaintiff testified that the Bend house was in poor shape when he bought it; it had no heat and was "condemned" after having sat vacant for three years. He testified that the first thing he did was install the safe, cabinets, and security system in the garage. Plaintiff testified that it took him two months to complete repairs, including painting, installing new carpet, replacing the broken heating system with central air, replacing the subfloor and placing tile in the bathrooms. He testified that he did not install new kitchen cabinets because the kitchen had been remodeled. Plaintiff testified that, after 2010, he successfully rented the Bend house on Home Away/VRBO. He could not recall if he rented the Bend house in 2010.

/ / /

B.      *Plaintiff's 2010 Income Tax Return, Audit, and Supporting Documentation*

Plaintiff testified that, in 2010, he employed a bookkeeper, so he did not keep his own books and was not familiar with his general ledger. Plaintiff testified that his former CPA prepared his 2010 tax returns. He testified that he kept all of his receipts and brought them to his former CPA, whom he relied upon. Plaintiff testified that, in 2010, he was in the midst of trying to settle pending litigation with his family members over the pallet business, so that complicated his tax filings. Minto testified that she did not prepare Plaintiff's 2010 returns, but she reviewed the work of his former CPA and found it to be somewhat sloppy. She testified that she thought his former CPA did the best he could with the available records.

On his 2010 Schedules C for Garrison Investment Group LLC, Plaintiff reported COGS expenses of $434,046, including purchases of $143,196, and depreciation of $148,868. (Ptf's Ex 10 at 10–11.) On his 2010 Schedule C for the pallet business, Plaintiff reported COGS expenses of $8,950, categorized as "other costs," and depreciation of $17,117. (*Id.* at 12.)

Minto testified that, of the combined total of $152,146 reported under the COGS-Purchases category,[3] Defendant allowed at audit $81,292 and disallowed $70,854. (*See* Ptf's Ex 9 at 4–5; Ex 14 at 1.) She testified that Defendant also disallowed an expense of $10,147 reported under the COGS-subcontractor category, which was in fact a mileage reimbursement for deliveries. (*See* Ptf's Ex 14 at 1.) Of the $165,985 in depreciation deducted by Plaintiff, Defendant allowed $38,295 and disallowed $127,690. (*See* Ptf's Ex 9 at 6–7.)

/ / /

/ / /

---

[3] Minto classified the $8,950 in "other costs" as "Purchases" and combined the COGS-Purchases from each Schedule C ($143,196 and $8,950) for a total of $152,146. (*See* Ptf's Ex 14 at 1.)

The amount allowed was for Plaintiff's band saw, trailers, trucks, ATM machines, and truck.[4] (*Id.*; *see also* Ptf's Ex 19 at 3.) Comacho-Scyoc's testimony confirmed the COGS-Purchases and depreciation disallowed by Defendant.

1. *COGS*

Minto testified that COGS includes "things purchased for resale" or things purchased to manufacture something in a manufacturing business. She testified that manufacturing expenses, such as tools, materials, products, freight, and subcontractors are included under COGS if used to manufacture an item. Minto testified that she reviewed Plaintiff's general ledger that included the delivery expense and also included nails, nail guns, lumber, band saws, tools, equipment, trailers, and vehicles totaling approximately $170,000. She testified that it was typical to use ledgers to determine COGS expenses. Minto testified that the $152,146 claimed for COGS-Purchases was determined based on audit reports and the former CPA's files. She testified that she was unable to reconcile that number based on Plaintiff's bank statements or general ledger, but provided some documents to Defendant including schedules of vehicles purchased. Minto testified that the $10,147 delivery expense was taken from the general ledger, under the COGS subcategory.

Defendant's audit adjustment explanation stated that Defendant sampled Plaintiff's "original documentation and journal entries for invoices of $1,000 or more." (Ptf's Ex 9 at 4.) Based on that technique, and including some additional credit card charges, Defendant allowed $81,292 of Plaintiff's claimed COGS-Purchases. (*Id.*) Minto testified that she tried to ascertain what Defendant wanted and was told "all the receipts." She testified that she provided what she had, but some of Plaintiff's records were missing. Plaintiff testified that his home was robbed in

---

[4] "Trucks" and "truck" are separate items with different acquisition dates. (Ptf's Ex 19 at 3.)

2013; the thief stole one of his trailers and loaded everything in his shed into the trailer. (*See* Ptf's Ex 8.) Plaintiff testified that one of the items stolen from his shed was a three-drawer filing cabinet with his records, some of which pertained to the 2010 tax year. (*See id.* at 6.)

### 2. *Depreciation*

Plaintiff provided two depreciation schedules: one "as originally filed" and the other "as corrected." (Ptf's Ex 19.) The primary difference between the two is the removal of the residence from the corrected schedule.[5] (*See id.*) Minto testified that Plaintiff's former CPA prepared the original schedule and she prepared the corrected schedule. She testified that the Bend house was placed into service in 2010 according to the depreciation schedule. Minto testified that the specific use of the house (cash depot vs. vacation rental) might have impacted which schedule it was reported on, but it would have been reported one way or the other. Minto testified that she saw some checks to VRBO in 2010 pertaining to the Bend house, but those were not provided as exhibits. She testified that Plaintiff did not report rental income or expenses associated with the Bend house on his 2010 Schedule E. (*See* Ptf's Ex 10 at 16.)

Defendant disallowed the following items on Plaintiff's depreciation schedule, each of which was reportedly acquired between June 30, and September 30, 2010: cabinets with a cost basis of $18,000; a residence with a cost basis of $99,500; furniture and equipment with a cost basis of $37,081; heating with a cost basis of $6,000; and floor cabinets with a cost basis of $8,000. (*See* Ptf's Ex 9 at 7; Ex 19 at 3.) Defendant's audit adjustment explanations stated that Plaintiff failed to establish a business use for those items. (Ptf's Ex 9 at 7.)

/ / /

/ / /

---

[5] Although the house was removed from the corrected depreciation schedule, Plaintiff claimed depreciation for it in this proceeding. (*See* Ptf's Written Closing at 6.)

Plaintiff testified that, as reported on the original 2010 depreciation schedule, his total purchase price for the Bend house was approximately $153,000. (*See* Ptf's Ex 19 at 3.) With respect to the $18,000 for cabinets, he testified that he thought some of that amount was probably for tile in the bathrooms. (*See id.*) With respect to the cabinets and safe in the garage, Plaintiff testified that he bought the items at Lowe's, then transported and installed them himself. Minto testified that Plaintiff's remodel work on the house might have been on the depreciation schedule because it improved the value of the house. She testified that she was not aware of depreciation taken on the safe, but it could have been under the furniture and equipment item.

Plaintiff provided some cancelled checks pertaining to the Bend house. (Ptf's Ex 21 at 9.) Minto testified that four such checks were for improvements to the house: one to Southtown Glass for $2,000; one to Cascade Garage Cabinets for $825; one to Cherry City for $100; and one to Lowe's for $403.99. Plaintiff testified describing numerous other cancelled checks that were for expenses related to the Bend house. Those checks were not admitted into evidence.

## II.  ANALYSIS

The issues presented for the 2010 tax year are (1) whether Plaintiff should be allowed additional COGS expenses of $70,854; (2) whether Plaintiff should be allowed a delivery expense of $10,147; (3) whether Plaintiff should be allowed an additional depreciation deduction for the Bend property and related improvements; and (4) whether the SUI penalty was properly imposed. (*See* Ptf's Written Closing at 1–3, 6; Ptf's Post-Tr Reply at 9–10.)

"The Oregon Legislature intended to make Oregon personal income tax law identical to the Internal Revenue Code (IRC) for purposes of determining [Oregon] taxable income, subject only to modifications specified in Oregon law." *Ormsby v. Dept. of Rev.*, 18 OTR 146, 151

(2004); *see also* ORS 316.007.[6]  "As a result, the legislature adopted, by reference, the federal definitions for deductions, including those under IRC section 162 for trade or business expenses. IRC section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]"  *Ormsby*, 18 OTR at 151.  To be "ordinary," "the transaction which gives rise to [the expense] must be of common or frequent occurrence in the type of business involved."  *Deputy v. DuPont*, 308 US 488, 495, 60 S Ct 363, 84 L Ed 416 (1940) (citing *Welch v. Helvering*, 290 US 111, 114, 54 S Ct 8, 78 L Ed 212 (1933)).  Necessary expenses are "appropriate and helpful" to the business.  *Welch*, 290 US at 113.

"All proceedings * * * of the tax court shall be original, independent proceedings and shall be tried * * * de novo."  ORS 305.425(1).  In a *de novo* proceeding, the tax court considers properly admitted testimony and evidence presented at trial "to reach the correct result without regard for either party's prelitigation position."  *Reed v. Dept. of Rev.*, 310 Or 260, 268, 798 P2d 235 (1990).  The court has jurisdiction to determine a taxpayer's tax liability, thereby correcting "any shortcomings that occurred during administrative adjudication * * *."  *Curtis v. Dept. of Rev.*, 17 OTR 414, 420 (2004).  Plaintiff is the party seeking relief in this matter and, therefore, bears the burden of proof to substantiate his claims by a preponderance of the evidence.  *See* ORS 305.427; *Reed*, 310 Or at 265.  The phrase "preponderance of the evidence" means "the greater weight of evidence, the more convincing evidence."  *Yarbrough v. Dept. of Rev.*, 21 OTR 40, 44 (2012) (quoting *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971)).

/ / /

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

The parties agree that some of Plaintiff's depreciation deductions, if allowed, would be subject to modifications under Oregon law.  (*See* Def's Post-Tr Br at 12 (citing ORS 316.707(1), (3); ORS 316.739(2), (3)); Ptf's Post-Tr Reply at 8–9.)

Taxpayers are required to maintain records sufficient to establish the amounts of their deductions. *Boyd v. Comm'r*, 122 TC 305, 320 (2004) (citing IRC § 6001); *see also* ORS 314.425 (providing the Department with authority to examine taxpayers' books, papers, and records). Generally, if a claimed business expense is deductible, but the taxpayer is unable to substantiate it fully, the court is permitted to make an approximation of an allowable amount. *Cohan v. Comm'r*, 39 F2d 540, 543–44 (2nd Cir 1930). The estimate must have a reasonable evidentiary basis. *Vanicek v. Comm'r*, 85 TC 731, 743 (1985).

A.      *COGS-Purchases*

COGS "is taken into account in computing gross income and is not an item of deduction." *Velinsky v. Comm'r*, 71 TCM (CCH) 2766, WL 173544 at *3 (1996). A COGS expense is appropriate "to offset receipts from the eventual sale of goods." *Hillenga v. Dept. of Rev.*, 21 OTR 396, 411 (2014), *rev'd in part on other grounds*, 358 Or 178 (2015). COGS expenses are subtracted from gross income where a taxpayer is engaged in the manufacture or sale of goods. Treas Reg § 1.61-3.

Plaintiff contends that he should be allowed additional COGS expenses of $70,854 for purchases associated with his pallet business. Based on the evidence presented, it is difficult to identify with any specificity the purchases that comprise that total. Plaintiff gave testimony generally describing some of the purchases he made for his pallet business: 19 box van trailers, seven or eight flatbed trailers, band saws, and other machinery and equipment. Plaintiff gave some recollections about his purchase prices, but he failed to properly submit *any* documentation

/ / /

/ / /

to support his testimony.[7] Plaintiff asks the court to rely on that testimony as sufficient evidence to meet his burden of proof. (*See* Ptf's Written Closing at 5.)

Although the court is persuaded that Plaintiff utilized trailers, band saws, and other machinery and equipment in his pallet business, the court is not persuaded by a preponderance of the evidence that Plaintiff is entitled to an additional COGS deduction of $70,854, or any other amount. In his testimony, Plaintiff acknowledged that he could not recall certain figures and relied instead on approximations. The court appreciates Plaintiff's candor, but cannot rely on vague testimony and approximations without any corroborating evidence.

Defendant identified another concern with relying entirely on Plaintiff's testimony: the possibility of double-counting deductions. (Def's Post-Tr Br at 5.) Plaintiff reported truck, trailer, and band saw purchases "on his depreciation schedules to claim a depreciation deduction" and Defendant "allowed the depreciation deduction for that equipment." (*Id.*) Defendant acknowledges that it is unclear "whether the truck and trailer purchases reflected on [Plaintiff's] depreciation schedule overlap with the WinCo trucks or other trailers that [he] purportedly purchased * * *." (*Id.*) However, given that Plaintiff testified that he had little or no knowledge of how his 2010 tax return was prepared, the court is concerned about the possibility of double deductions for the trucks, trailers, and band saw.

Plaintiff also expressed dissatisfaction at the sampling method utilized by Defendant's auditor. (Ptf's Written Closing at 4–5.) As discussed above, this is a *de novo* review and Plaintiff must provide sufficient evidence to meet his burden of proof. He has failed to do so.

/ / /

---

[7] Plaintiff argues that a bill of sale not admitted into evidence would have established his entitlement to the purchases of the tractors from WinCo. (Ptf's Post-Tr Reply at 4.) He further argues that a Profit & Loss Detail and Balance Sheet Detail not admitted into evidence supported his testimony regarding ten trailers purchased for $10,000 apiece. (*Id.* at 5.) As discussed above, exhibits must be timely exchanged under TCR-MD 12.

B.    *Delivery Expense*

Plaintiff requests that the court allow him a $10,147 expense reported under the COGS-subcontractor category that was in fact a delivery expense and "should have been reported in the 'Freight Expense' subcategory of Cost of Goods Sold." (Ptf's Written Closing at 3.) Plaintiff argues that his categorization error does not affect deductibility. (*Id.*) Defendant correctly responds that Plaintiff "fails to point to anything in the record before the court that substantiates the 'delivery expenses' that he purportedly misreported." (Def's Post-Tr Br at 6.) The court received no documentary evidence, and limited testimony, supporting the delivery expense. The court finds that Plaintiff failed to meet his burden of proof with respect to the delivery expense.

C.    *Depreciation*

The parties dispute whether Plaintiff is entitled to a depreciation deduction for the Bend house along with associated improvements and purchases (collectively, the "Bend property"), described on his depreciation schedule as cabinets, furniture and equipment, heating, and floors/cabinet. (Ptf's Written Closing at 6.) Taxpayers may deduct "a reasonable allowance for the exhaustion, wear and tear * * * of property used in [a] trade or business, or * * * held for the production of income." IRC § 167(a). "The period for depreciation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service." Treas Reg § 1.167(a)-10(b). "Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function[.]" Treas Reg § 1.167(a)-11(e)(1)(i); *see also Wilson v. Comm'r*, 83 TCM (CCH) 1317 (2002), WL 341045 at*15, *aff'd* 71 Fed Appx 623 (9th Cir 2003).

/ / /

/ / /

The first question is whether the Bend property was placed in service in 2010. If it was not, then Plaintiff is not entitled to a depreciation deduction for the Bend property in 2010 and the court need not address further issues pertaining to his depreciation deduction.

Plaintiff described two business uses of the Bend property: first, as a cash depot for his ATM business and, second, as a vacation rental property. The court will begin with the vacation rental property use. Plaintiff reportedly purchased the Bend house in mid-2010 and testified that, at some point after his purchase, spent two months making repairs, including painting, installing new carpet, replacing the broken heating system, and replacing subfloor and tile in the bathrooms. Plaintiff testified that the house was "condemned" and "uninhabitable" at the time of his purchase. (*See* Ptf's Written Closing at 6.) The house was not, therefore, "in a condition or state of readiness and availability" for use as a vacation rental property. It is unclear from the testimony and documentary evidence when the house achieved that state of readiness. Plaintiff failed to produce any evidence that might have answered that question, such as the first listing of the house for rent on VRBO/Home Away.

With respect to Plaintiff's other use of the Bend property as a cash depot, Plaintiff testified that the first thing he did upon purchasing the house was install a safe, cabinets, and security system in the garage. He presented no evidence of the date of those installations. If Plaintiff completed those installations in 2010, then at least some part of the Bend property was placed in service for use in Plaintiff's ATM business in 2010. However, the court is not persuaded that Plaintiff is entitled to take a depreciation deduction based on the total cost basis of the Bend property, given that he only used the garage, safe, security system, and garage cabinets for business purposes in 2010. The court received no evidence from which it can make a reasonable allocation of the house's cost basis to the garage. Other items used for the cash

depot—the safe, security system, and garage cabinets—were likely not reported on the depreciation schedule.  Thus, the court finds it has no reliable evidence from which to determine any depreciation deduction for Plaintiff's use of the Bend property as a cash depot in 2010.

D.    *Missing Documents due to Theft*

A theme throughout this analysis is Plaintiff's lack of documentary evidence.  Plaintiff explains his lack of documentary evidence, in part, based on the theft of many of his 2010 records in 2013.  (*See* Ptf's Post-Tr Reply at 3, 6.)  Plaintiff provided a police report and other records demonstrating that he reported the theft.  The question becomes whether Plaintiff's loss of some documentary evidence due to circumstances beyond his control (theft) entitles Plaintiff to rely entirely upon testimony.

As noted above, courts have long been permitted under the *Cohan* rule to make an approximation of a taxpayer's deductible business expenses, although the estimate must have a reasonable evidentiary basis.  "Without such a basis, any allowance would amount to unguided largess."  *Roumi v. Comm'r*, 103 TCM (CCH) 1006, WL 10811 at *3 (2012).  "Where records have been lost because of circumstances beyond a taxpayer's control, he must still undertake a 'reasonable reconstruction,' which includes substantiation through secondary evidence."  *Probandt v. Comm'r*, 112 TCM (CCH) 65, WL 3962107 at *9 (2016); *Roumi*, 2012 WL 10811 at *3 ("If a taxpayer's records are lost or destroyed through circumstances beyond his control, the taxpayer may still substantiate the claimed deductions by use of other credible evidence.").[8]

---

[8] These and other cases refer to Treas Reg section 1.274-5T(c)(3)(iii)(5), which states:

"Where the taxpayer establishes that the failure to produce adequate records is due to the loss of such records through circumstances beyond the taxpayer's control, such as destruction by fire, flood, earthquake, or other casualty, the taxpayer shall have a right to substantiate a deduction by reasonable reconstruction of his expenditures or use."

Treas Reg section 1.274-5T(c)(3)(iii)(5) applies to strict substantiation under IRC section 274(d), which supersedes the *Cohan* rule with respect to certain expenses such as travel, meals, and entertainment.

Although some of Plaintiff's records were lost due to circumstances beyond his control, he failed to provide a "reasonable evidentiary basis" from which the court may approximate his expenses. He failed to provide any secondary evidence of his claimed expenses and deductions, even though some such evidence existed (cancelled checks, ledgers, bank statements, and perhaps more). Providing evidence of the theft does not supplant the requirement of providing evidence of claimed expenses and deductions.

E.    *SUI Penalty*

Plaintiff argues that the SUI penalty should not have been imposed in this case because he relied on his former CPA to prepare his 2010 return and the errors made by his former CPA were not Plaintiff's fault. (Ptf's Post-Tr Reply at 9–10.) Plaintiff acknowledges that ORS 314.402(6) grants "the department" authority to waive all or any part of the SUI penalty. (*Id.* at 9.) Defendant responds that the SUI penalty is mandatory and applies when a taxpayer understates its Oregon taxable income by over $15,000. (Def's Post-Tr Br at 13 (citing ORS 314.402).) Taking into account the parties' stipulations and assuming the disputed items are disallowed, Defendant determined Plaintiff's 2010 understatement of income is $467,147. (*Id.*)

Under ORS 314.402, when reported income is understated in excess of $15,000 in a taxable year, "there shall be added to the amount of tax required to be shown on the return a penalty equal to 20 percent of the amount of any underpayment of tax attributable to the understatement of taxable income." The text of ORS 314.402 is mandatory, requiring the penalty when taxable income is understated by more than $15,000. The Department of Revenue has authority to "waive all or any part of the penalty imposed under this section on a showing by

/ / /

the taxpayer that there was reasonable cause for the understatement, or any portion thereof, and that the taxpayer acted in good faith." ORS 314.402(6).

The court concludes that the SUI penalty was correctly imposed for the 2010 tax year because Plaintiff understated his taxable income by more than $15,000. The legislature gave the Department of Revenue, not the court, the authority to waive all or part of the SUI penalty.

### III. CONCLUSION

After careful consideration, the court finds that, for the 2010 tax year, Plaintiff failed to prove by a preponderance of the evidence that he is entitled to any Schedule C business expenses or deductions beyond those agreed upon in the parties' Stipulation or previously allowed by Defendant. The court further finds that Defendant properly imposed the SUI penalty for the 2010 tax year and the court may not waive that penalty. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's 2009 and 2010 Oregon income tax liability is adjusted pursuant to the attached Stipulation of the parties.

IT IS FURTHER DECIDED that Plaintiff's appeal is denied with respect to the remaining issues presented for decision for the 2010 tax year.

Dated this ____ day of December 2016.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on December 28, 2016.*