IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| TERRY A. DAVIS | ) | |
| and CHEYLEEN M. DAVIS, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 190099G |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

This case concerns whether Plaintiffs' ranching was a for-profit activity generating deductible business expenses in tax years 2014 and 2015. At trial, Plaintiffs were represented by Kent J. Bailey, CPA, and both Plaintiffs and Mr. Bailey testified. Defendant was represented by David Lenhart and did not call any witnesses. Plaintiffs' Exhibits 1 to 7, 9 to 13, 15 to 18, and 20 were admitted. Defendant's Exhibits A to F were admitted.

I. STATEMENT OF FACTS

During the years at issue, Plaintiffs lived, grew hay, and leased pasture at Beaver Creek Ranch, their 305-acre ranch near Baker City.

Plaintiffs had purchased the ranch in 2010 in fulfillment of a lifelong dream and a 35-year search. After growing up on farms in Michigan and attending college there, they moved to Oregon in 1974. (Ex 1 at 1.) Plaintiffs began looking for a ranch immediately, but could not afford to buy one at that time. In 1979 they bought five acres of bull pasture near Sumpter for $15,000 with the intention of building a house, selling it, and using the proceeds of the sale to buy a ranch. (*Id.*) Plaintiffs eventually built a log house on the Sumpter property without borrowing any money. (Ex 12 at 2–6.) Plaintiffs performed essentially all the work themselves,

with Mr. Davis designing and building machinery as needed. (*Id.*) Building began in 1984 and "took years to finish." (*Id.*)

The rising cost of small working ranches led Plaintiffs to remain in Sumpter for many years. (Ex 1 at 1.) While there, Plaintiffs raised a few calves annually for meat and sale. (Ex 12 at 9–11.) They befriended members of the ranching community—especially their neighbors, the Warnocks, who introduced them to a small-paddock grazing method they would later use at Beaver Creek Ranch. (*Id.* at 13–14.) All the while, Plaintiffs supported themselves through their other occupations: Mrs. Davis taught Biology at Baker Middle School, and Mr. Davis became an internationally recognized craftsman of folding knives. (*Id.* at 12, 15–20.)

By 2010, an inheritance had made purchasing a ranch feasible. Mrs. Davis had retired from teaching middle school and was collecting a pension while teaching part-time at the community college in Baker City. Plaintiffs' plan was to buy a lower-cost ranch they could then improve, the way they had improved their land in Sumpter. (Ex 1 at 1.) They found such a ranch at Beaver Creek, eight miles outside of Baker City.

They bought Beaver Creek Ranch in March 2010 for $400,000 without equipment. (Exs 7 at 2; 1 at 2.) It was "rundown with an outdated ditch irrigation system" and a nonpaying tenant residing at the ranch house. (Ex 7 at 2.) The fences, irrigation system, and house were all in disrepair. (Ex 1 at 2.)

Upon purchasing the ranch, Plaintiffs immediately began reestablishing irrigation and removing weeds, harvesting their first crop of hay that year. They also began building and rebuilding fences in anticipation of grazing, which began in 2011. Tending to weeds and irrigation would be a constant concern of theirs going forward. In 2011, Plaintiffs dug a well and began building a shop. (*Id.* at 3.) In 2012, their tenant left and they began cleaning out the ranch

house. Mr. Davis ceased making custom knives, devoting his full efforts to the ranch. (Ex 12 at 15.) In 2014, final interior work on the shop was completed, and Plaintiffs moved the contents of their Sumpter shop to the new shop at Beaver Creek Ranch. (Ex 1 at 4.) In 2015, Plaintiffs sold their Sumpter home for $250,000 and were living in the ranch house at Beaver Creek. By then, Mrs. Davis had retired from teaching at the community college, and both Plaintiffs were ranching exclusively.

From 2010 to 2016, Plaintiffs spent $87,301 on ranch equipment. (Ex 11 at 1.) Plaintiffs already had a tractor they had bought while living in Sumpter. (*Id.*) They made several equipment purchases shortly after purchasing the ranch, most notably a backhoe and a dump truck. (*Id.*) In 2012, they bought a mower and a baler for harvesting hay, as well as a second tractor. (*Id.*) 2014 and 2016 saw further major purchases of a skid steer and a no-till drill. (*Id.*) Plaintiffs generally bought "old repairable equipment" to reduce costs; their backhoe was a 1973 model, and their second tractor was a 1953 model. (Ex 13 at 21.)

Plaintiffs' ranch generated income from hay sales and from leasing pasture for cattle grazing. Plaintiffs reported operating expenses for several items, the largest of which were repairs, vehicles, supplies, equipment rental, fuel, taxes, custom hire for hay-cutting, and utilities. (Ex 10 at 1.) Plaintiffs also reported depreciation expenses from their equipment purchases. The following chart summarizes Plaintiffs' reported revenue and expenses through 2018:

|      | Revenue | Operating Expenses | Depreciation |
|------|---------|--------------------|--------------|
| 2010 | $3,855  | $25,087            | $42,442      |
| 2011 | $4,780  | $37,719            | $28,879      |
| 2012 | $2,553  | $23,808            | $26,709      |
| 2013 | $2,136  | $23,192            | $28,161      |
| 2014 | $4,615  | $21,486            | $29,025      |
| 2015 | $3,837  | $26,790            | $22,538      |
| 2016 | $4,443  | $24,408            | $23,201      |
| 2017 | $6,693  | $15,069            | $21,732      |
| 2018 | $6,349  | $12,788            | $9,407       |

(Ex 10 at 1; Ex D at 1.)  A number of factors affected the ranch's revenue and expenses over the years.  Expenses spiked in 2011 due to the repair bill for one machine; thereafter, Mr. Davis began repairing the ranch equipment himself to save costs.  In 2012, much of the hay crop was lost because Plaintiffs' custom hire was unavailable; to prevent a reoccurrence, Plaintiffs purchased their own baler.  In 2013, severe drought conditions reduced the yield of hay.  (Ex 1 at 7.)  In general, Plaintiffs' improvements to the irrigation system and fencing tended to increase the yield and quality of hay, as well as the length of time cattle could graze.  Plaintiffs charged market prices for their hay and pasture, which were of high quality.

Plaintiffs count the increase in the value of the ranch as additional "economic income." (Ex 10 at 1.)  A Baker City broker prepared a competitive market analysis recommending a list price of $664,488 for the ranch as of January 22, 2018.  (Ex 6 at 10.)  After subtracting the costs they incurred for the new well, fence, and shop, Plaintiffs calculate the ranch appreciated an average of 3.7 percent per year between 2010 and 2018.  (Ex 18 at 1.)  Distributing the gain over that period, Plaintiffs count annual "economic income" rising steadily from $14,800 in 2010 to $23,591 in 2018.  (Ex 10 at 1.)

Plaintiffs' plan to eventually sell the ranch when they are no longer able to operate it themselves, perhaps in eight or nine years.  As was the case in Sumpter, they expect the labor they have invested in their property will result in its increasing in value.  Including both revenue and ranch appreciation as "economic income," Plaintiffs show generally diminishing losses from 2010 to 2017 and a net gain of $7,745 in 2018 after subtracting expenses and equipment depreciation.  (Ex 10 at 1.)  They anticipate somewhat larger gains in years to come through sales of excess equipment, increased return on hay, and reduced expenses.  (*Id*. at 2.)

A few additional details are included where pertinent in the analysis below.

Plaintiffs claimed their operating expenses and depreciation as Schedule F farming loss on their 2014 return, which Defendant disallowed in its Notice of Deficiency, issued January 4, 2018. (Exs 19 at 2, 8; A at 1.) Defendant sustained its 2014 adjustment at conference. (Ex B.) Plaintiffs similarly claimed Schedule F losses on their 2015 return, which Defendant disallowed. (Exs E at 5; C.)

On appeal, Plaintiffs ask the court to reverse Defendant's adjustments and Defendant asks the court to uphold them.

## II. ANALYSIS

At issue is whether Plaintiffs' ranching was a for-profit activity entitling them to deduct expenses under section 162 of the Internal Revenue Code (IRC). The IRC applies because Oregon taxable income is equal to federal taxable income where, as here, no modifications peculiar to Oregon are relevant. *See* ORS 316.022(6); 316.048.[1] Plaintiffs, as the parties asking the court to change the tax assessment, must bear the burden of proof. *See* ORS 305.427.

IRC section 162(a) allows a deduction for expenses of carrying on a "trade or business," and an activity can only be a "trade or business" if the taxpayer engages in it primarily to obtain income or profit. *Commissioner v. Groetzinger*, 480 US 23, 35, 107 S Ct 980, 94 L Ed 2d 25 (1987). The expectation of actually making a profit need not be reasonable, so long as profit is the taxpayer's "actual and honest objective." Treas. Reg. § 1.183–2(a); *Dreicer v. Comm'r*, 78 TC 642, 644–45 (1982), *aff'd*, 702 F2d 1205 (DC Cir 1983). As is generally the case where a taxpayer's qualification for a deduction depends on intent, objective facts are more persuasive than statements of intent. Treas. Reg. § 1.183–2(a); *Hudspeth v. Dept. of Rev.*, 4 OTR 296, 298–99 (Or Tax 1971).

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

A.      *Scope of Activity*

In order to determine whether an activity is engaged in for profit, it is necessary to determine what undertakings fall within the scope of a single activity. Treas. Reg. § 1.183–1(d)(1). Multiple undertakings may constitute one activity or may each be separate activities. *Id*. If they are separate activities, the deductions and income from each undertaking are not aggregated in determining whether each is engaged in for profit. *Id*.

In determining whether multiple undertakings constitute one activity, the most significant factors are "the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings." Treas Reg § 1.183–1(d). Courts have identified additional factors for consideration.[2]

In the case of land being farmed, a question may arise whether the farming and the holding of the land for appreciation are separate activities. Because farming is closely tied to land, the economic interrelationship between the two undertakings is often clear. Under certain circumstances, however, the farming may not contribute to the landowner's profit objective:

> "A typical case would arise when the land value is increasing through urban
> expansion, creating a demand for land to be used for purposes other than farming.
> It can be argued that the appreciation will continue whether or not the land is
> farmed, and thus the profit motive is not in farming, but is in land speculation
> which should be treated separately from the farming."

---

[2] For example: "(a) Whether the undertakings are conducted at the same place; (b) whether the undertakings were part of the taxpayer's efforts to find sources of revenue from his or her land; (c) whether the undertakings were formed as separate businesses; (d) whether one undertaking benefited from the other; (e) whether the taxpayer used one undertaking to advertise the other; (f) the degree to which the undertakings shared management; (g) the degree to which one caretaker oversaw the assets of both undertakings; (h) whether the taxpayer used the same accountant for the undertakings; and (i) the degree to which the undertakings shared books and records." *Mitchell v. Comm'r*, 92 TCM (CCH) 17, WL 1867342 at *4 (2006) (holding tree-planting, timber harvesting, and haying were single farming activity).

William K. Waugh III, *The Effect of Unrealized Appreciation in Determining Profit Motive in Farming Enterprises*, 16 U Kan L Rev 529, 535 (1968) (footnote omitted). Where holding land and farming it are separate activities, deductions for farming expenses are only allowable if the farming is intended to realize a profit without regard to gains from land appreciation.

In determining whether farming and holding land are one activity, a threshold determination must be made whether the "land is purchased or held primarily with the intent to profit from increase in its value[.]" *See* Treas. Reg. § 1.183–1(d)(1). If so, "the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value." *Id*. If not, the taxpayer's characterization of the activity is generally accepted. *See id*. Thus, where land is purchased or held for speculative purposes, its being farmed is not part of that profit-seeking activity unless farming income exceeds farming deductions. *Id*. On the other hand, where land is purchased to be farmed, the holding of the land and the farming of it are one activity, even where the land appreciates while the farming results in a net loss. *See id.; Engdahl v. Comm'r*, 72 TC 659, 668 n 4 (1979) (so concluding where taxpayers purchased property primarily for horse-breeding activity); *Welch v. Comm'r*, 114 TCM (CCH) 578, WL 5624726 at *12 (2017) (so concluding where parties agreed "land was purchased to be used as working ranch land").

In the present case, the court finds that Plaintiffs purchased Beaver Creek Ranch as a working ranch. That was their credible testimony, to which Defendant offered no rebuttal. Such an intention is consistent both with Plaintiffs' personal history, which shows a longstanding interest in working the land rather than speculating to make a profit, and with Plaintiffs' course of conduct after purchasing the ranch. In addition, the factors present in the typical case of land speculation—population growth increasing demand for land for nonfarming purposes—appear to

be lacking eight miles outside of Baker City.[3]  There is no dispute that Plaintiffs' haying and pasture-leasing undertakings were parts of a single farming activity.  Because farming was Plaintiffs' purpose in owning the ranch, holding the land was also part of that activity.  *See Welch*, 2017 WL 5624726 at \*12.  The land's appreciation in value should therefore be considered when evaluating whether Plaintiffs farmed for profit.

B.      *Profit Intent*

The Treasury Regulations provide a nonexclusive list of nine factors that have proven helpful in distinguishing "activity deliberately and conscientiously pursued for profit."  *Hillenga v. Dept. of Rev.*, 21 OTR 396, 405 (2014), *aff'd in part, rev'd in part on other grounds*, 358 Or 178, 361 P3d 598 (2015).  The nine factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used may appreciate in value; (5) the taxpayer's success in carrying on other activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits earned; (8) the taxpayer's financial status; and (9) elements of personal pleasure or recreation.  Treas Reg § 1.183–2(b).  The factors are not to be applied formulaically—it is not a question of counting up factors for and against.  *Id*.; Treas Reg § 1.183–2(b).

1.      Factors

As is typical, the present case presents several factors that are suggestive, but not dispositive.  With respect to the factor 1, Plaintiffs showed willingness to make changes to

---

[3] The court takes judicial notice that the United States Census reports the 2010 population of Baker City was 9,828 and the 2010 population of all Baker County was 16,131.  As of July 1, 2018, the populations of both areas were estimated to have declined slightly from their 2010 levels.

https://www.census.gov/quickfacts/fact/table/bakercitycityoregon,bakercountyoregon/PST045219

improve the ranch's efficiency, such as creating additional pastures and irrigation systems, personally repairing their equipment, and purchasing a baler. Their business plan and recordkeeping were rudimentary, but probably sufficient for the simplicity of their operation. Regarding factor 2, Plaintiffs demonstrated expertise in ranching and in general problem-solving, as well as willingness to consult with others. Regarding factor 3, Plaintiffs devoted their principal efforts to ranching, both of them retiring from other employment to do so. Each of those three factors would be consistent with either a profit motive or with Plaintiffs' being retired hobbyists. As to factor 9, Plaintiffs' evident satisfaction with their ranching lifestyle provides little ground for suspecting their intent. This is not a case where a taxpayer asserts an activity usually thought of as recreational is a business. Standing alone, "the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit." Treas Reg § 1.183–2(b)(9).

Regarding factor 8, Plaintiffs had sufficient income to support themselves and cover their losses, suggesting they had no need to profit from ranching and could receive a tax benefit from ranching expenses. However, there is evidence that Plaintiffs placed a high value on staying out of debt.[4] Plaintiffs could hardly begin farming without debt unless they had achieved some financial stability. Their financial position is consistent with their stated reasons for waiting so long to begin ranching.

Regarding factors 6 and 7, Plaintiffs had never turned a profit as of the years at issue and had a long history of farming losses exceeding farming income. However, the interpretation of that history depends a great deal on the extent to which Plaintiffs expected gain from the

---

[4] The title of their mentor's book is "You Can't Borrow Yourself Rich." (Ex 12 at 13.) Plaintiffs lived out that philosophy at Sumpter before purchasing the ranch, preferring to build their own log house rather than take out a mortgage.

appreciation of their land, the subject of factor 4.

In considering factor 4, the appreciation of Plaintiffs' land should be included because Plaintiffs' ranching activity included holding the land, as discussed above. Plaintiffs' unrebutted evidence showed the land appreciating at an average of 3.7 percent per year during the period at issue. That increase in value—presumably at least partly due to Plaintiffs' work irrigating, establishing new pastures, and otherwise operating the ranch—counterbalanced an increasing proportion of Plaintiffs' yearly operating expenses and eventually exceeded expenses in subsequent years.

2.  Recoupment of Losses

Defendant argues that factor 4 does not favor Plaintiffs because they are unlikely to recoup prior years' losses, even if asset appreciation begins covering their operating expenses. By Plaintiffs' accounting, their net "economic" losses totaled over $200,000 by the years at issue, even factoring in land appreciation. (Ex 10 at 1.)

The question of whether taxpayers should be expected to recoup prior years' losses to show profitability has received different answers in two lines of U.S. Tax Court cases. Both lines may be traced back to *Bessenyey v. Commissioner*, 45 TC 261 (1965), *aff'd*, 379 F2d 252 (2d Cir 1967). In *Bessenyey*, the court evaluated the profit objective of a Hungarian émigrée who bred and trained horses of a blood line native to her homeland. Noting that large initial losses in a business are "not inconsistent with an intention to achieve a later profitable level of operation," the court observed that "the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." 45 TC at 274. Ultimately, the court found that the taxpayer lacked the requisite profit objective. *Id*. at 275.

The Second Circuit affirmed because the trial court's decision was not clearly erroneous, but Judge Friendly observed that the lower court's ultimate finding of fact would be out of line with "a curve plotted through the irreconcilable body of cases in this general area[.]" 379 F2d at 256.

In one line of subsequent cases, courts have cited *Bessenyey* as requiring the taxpayer's projected asset appreciation be sufficient to recoup losses from prior years. *See*, *e.g.*, *Golanty v. Comm'r*, 72 TC 411, 427 (1979), *aff'd*, 647 F2d 170 (9th Cir 1981) (finding no profit where appreciated total value of horses fell far below seven years' increasing losses totaling $129,552). persuasive of no profit objective where horses ); *Hillman v. Comm'r*, 78 TCM (CCH) 210 (1999) (finding no profit objective where horse appreciation fell "significantly short" of accumulated losses and rate of losses outstripped rate of appreciation in succeeding years); *Bronson v. Comm'r*, 103 TCM (CCH) 1112 (2012), *aff'd*, 591 Fed Appx 625 (9th Cir 2015) (finding no profit objective where "the appreciation in the horses would recoup no more than a fraction of the $837,752 in cumulative losses").

Another line of cases interprets the "intervening years" mentioned in *Bessenyey* as referring to the time period between the year at issue and the projected date of future profitability. The reasoning underlying these cases is found in *Helmick v. Commissioner*, 98 TCM (CCH) 269 (2009), wherein the court criticized the position that "the requisite profit motive as of any given year must involve an expectation that even all *past* losses will be recouped, so that the activity will have generated a net profit over its entire course." The court reasoned by way of a hypothetical:

> "If a natural disaster caused the death of 90 percent of a rancher's herd and resulted in a catastrophic loss that could never be recouped, but the rancher thereafter expected to generate an overall prospective profit by breeding and selling the remaining 10 percent of his herd on a foregoing basis, then he could not be said to lack a profit objective after the disaster merely because he would never recoup the prior loss. * * *."

*Helmick*, 2009 WL 3012725 at *10 (finding appreciation of horse herd and maintenance of ranch's "equestrian center" zoning status weighed in favor of profit objective despite accumulated prior years' losses over $400,000). In other words, "if a taxpayer can expect to generate an overall profit from the current year onward, then it can't be said that he lacks a profit objective simply because he will never generate an overall profit over the lifetime of the activity." *Metz v. Comm'r*, 109 TCM (CCH) 1248 (2015) (finding asset appreciation factor neutral without regard to $20 million in prior years' accumulated losses); *see also Welch*, 2017 WL 5624726 at *35–*36; *Robison v. Comm'r*, 115 TCM (CCH) 1501 (2018) (finding asset appreciation factor neutral where evidence insufficient to determine current value of taxpayers' basis in ranch property).

No cases citing *Helmick* have disagreed with its reasoning on recoupment of prior years' losses, and this court finds that reasoning persuasive. The pertinent question under IRC section 183 is whether a taxpayer has a profit intent in a given year. Prior years' accumulated losses may certainly indicate lack of profit objective in prior years and, if a taxpayer takes no steps to improve matters, in subsequent years as well. *Cf. Golanty*, 72 TC at 428 (finding taxpayer's subsequent act reducing number of broodmares had "reduced the chances of the operation breaking even"). But where a taxpayer has made efforts to correct course and achieve future profitability, losses which can no longer be helped do not set a baseline that must be reached to have a current profit objective.

Here, Plaintiffs' prior years' losses had several causes, including startup costs for equipment, inefficient irrigation and use of pasture, and severe drought conditions in 2013. Plaintiffs took steps to remedy those causes insofar as they were able up to and through the years at issue. In evaluating whether ranch appreciation would allow them to recoup their losses, the

court considers only their losses beginning in 2014. *See Helmick*, 2009 WL 3012725 at \*10.

The share of the ranch's appreciation attributable to 2014 and 2015 came within $2,000 of Plaintiffs' total net operating income over that period, and appreciation exceeded net operating income thereafter. It seems clear Plaintiffs expected to recoup their operating expenses going forward.

Plaintiffs concede some allocation should have been made in the accounting for the contributory value of the old ranch house to the property's total appreciation, although Mr. Bailey testified the amount would not change the overall trend toward profitability. Mr. Bailey's opinion is supported by evidence that Plaintiffs place little value on the house—they have recently begun building a new house and intend to use the old one as a plant shed. Defendant offered no rebuttal testimony or evidence.

Plaintiffs claimed additional losses from equipment depreciation in 2014 and 2015. At trial, Plaintiffs argued the depreciation expenses would be largely recaptured upon sale. They had purchased old equipment on the used market, repaired it themselves, and expected to recoup large portions of their original purchase prices. Plaintiffs provided an inventory stating each piece of equipment's cost and fair market value as of January 2018, amounting to approximately 80 percent of total cost. (Ex 11 at 1.) Although Defendant did not challenge Plaintiffs' figures, the evidence on which Plaintiffs based them was not provided, and the court is in no position to value Plaintiffs' equipment. However, there was apparently an active market for used equipment, with Plaintiffs' buying operable, decades-old farm machinery. Given Plaintiffs' overall credibility, the court finds it probable they expected to recoup a significant portion of their equipment expenses.

All told, factor 4 supports Plaintiffs' case. The appreciation of the ranch, together with ranch revenue and Plaintiffs' expectation of recouping used equipment costs, show a path to

profitability that Plaintiffs could credibly intend to follow.

Regarding factor 5, Plaintiffs' personal history shows confidence that by working hard and solving problems they can make something valuable. They made a beautiful home out of bull pasture in Sumpter. Mr. Davis made world-class folding knives. In each case, their planning and labor transformed low-cost materials into something for which others were willing to pay a significantly higher price. It is probable they believed their hard work at Beaver Creek Ranch would similarly pay off in the end.

Absent any rebuttal from Defendant, the evidence shows Plaintiffs had "the actual and honest objective of making a profit." *See Dreicer*, 78 TC at 644–45. It is immaterial whether Plaintiffs' hope for profit was reasonable; their intent qualifies their ranching expenses as business expenses. *See* Treas Reg § 1.183–2(a).

### III.  CONCLUSION

Plaintiffs' ranching activity was a "trade or business" for which they were entitled to deduct expenses under IRC section 162(a). Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted.

Dated this _____ day of April 2020.

POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on April 8, 2020.*